UNITED STATES of America, Appellee,

v.

Paul W. LADD, Defendant, Appellant.

No. 88–1486.

United States Court of Appeals, First Circuit.

Heard March 2, 1989.

Decided June 15, 1989.

As Amended June 20, 1989.

Willie J. Davis, by Appointment of the Court, with whom Davis, Robinson & Smith, was on brief, for defendant, appellant.

Paul V. Kelly, Asst. U.S. Atty., with whom Jeremiah T. O'Sullivan, U.S. Atty., Boston, Mass., was on brief, for the U.S.

Before CAMPBELL, Chief Judge, COFFIN, Senior Circuit Judge, and BOWNES, Circuit Judge.

BOWNES, Circuit Judge.

Paul W. Ladd, the defendant, was convicted by a jury on both counts of an indictment for counterfeiting crimes. Count one charged Ladd with possession of counterfeit currency, 18 U.S.C. § 472;[1] count two charged Ladd with receipt of counterfeit currency, 18 U.S.C. § 473.[2] Ladd appeals his convictions on several grounds.[3] For the reasons set forth below, we affirm on count one and reverse on count two.

## I. FACTS

"Our review of the facts is made in the light most favorable to the government and drawing all reasonable inferences in its favor." *United States v. Foley*, 871 F.2d 235, 236 (1st Cir.1989).

In 1984, Ladd and Elsworth Roston met; Roston was already an expert counterfeiter. The two quickly became close associates and decided to become business associates. Their business was to be the printing and distribution of counterfeit currency, with Roston doing the printing and Ladd handling the distribution in the Boston area.[4] Ladd was also to provide Roston with financial assistance. Both of them were to experiment with various chemicals that would remove the ink from small denomination bills in order to reprint them as higher denomination bills.

In 1986, Roston moved to California, but he and Ladd kept in touch by telephone. Roston moved frequently and never told Ladd how to reach him. Rather, Roston would contact Ladd by calling Ladd's house collect. Starting in December of 1986 and continuing through early 1987, Roston sent Ladd six packages of counterfeit currency totalling $157,000 in $100 and $20 bills. All shipments were addressed to Ladd at his house. The return addresses on the packages displayed the name "Mr. Pedro Gonzalez" at various incorrect addresses. Ro-

---

1. This section provides:
   Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both.

2. This section provides:
   Whoever buys, sells, exchanges, transfers, receives, or delivers any false, forged, counterfeited, or altered obligation or other securi-

ty of the United States, with the intent that the same be passed, published, or used as true and genuine, shall be fined not more than $5,000 or imprisoned not more than ten years, or both.

3. Ladd's attack on the constitutionality of the sentencing guidelines must be rejected. *see Mistretta v. United States*, — U.S. —, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).

4. Roston already had distributors in two other cities.

ston also used the alias Pedro Gonzalez when calling Ladd collect.

In exchange for the counterfeit currency, Ladd paid Roston approximately $7,000 in real currency via Western Union. These payments were made to a Mr. Michael Altman, another alias Roston used, and were made in such a way as not to require an address or location for the recipient.

In early 1987, Roston discontinued sending Ladd counterfeit currency because he felt that the amount Ladd paid was insufficient. Roston and Ladd had no further contact until October 29, 1987.

On October 14, 1987, Roston was arrested by the Secret Service; he immediately agreed to cooperate. He turned over $1,800,000 in counterfeit currency and named his distributors, including Ladd. Roston agreed to call Ladd and set up another shipment of counterfeit currency to him. On October 29, 1987, a Secret Service agent dialed Ladd's number, which was provided by Roston, and Roston spoke with Ladd. It was agreed that Roston would send Ladd a package containing $25,000 in counterfeit $50 bills and $10,000 in counterfeit $100s by overnight express, with the shipment arriving on Tuesday, November 3, 1987. The two also discussed their efforts to remove the dye from real money. This call was taped and the tape was introduced at trial.

The Secret Service sent a package from its California office to its Boston office containing the agreed upon amount using bills given to them by Roston. On November 3, Secret Service agents went to Ladd's address in a United Parcel Service (UPS) truck with the package. One agent, Allen Hobson, was dressed as a delivery man; two other agents were in the back of the UPS truck. There were other Secret Service agents in two automobiles.

As Hobson walked toward Ladd's house with the package, Ladd met him on the sidewalk and said "I'll take that package from you." Upon being told that identifi-cation was required, Ladd went into the house and returned with a driver's license. Hobson then had Ladd sign a sheet on a clipboard. Next, Hobson tore off the receipt that was on the package and had Ladd sign that. Ladd was then arrested. He had never touched the package containing the counterfeit currency.

Ladd was indicted on two counts: (1) possession of the counterfeit currency in late 1986 and early 1987 for which Ladd paid Roston $7,000, and (2) receipt of the package on November 3, 1987.

At trial, Roston testified for the government and the tape of his conversation with Ladd was introduced as evidence. The government also introduced a tape of a February 25, 1987 conversation between Ladd and Herman Buffington, one of Ladd's distributors. This tape was made after Buffington was arrested by the Secret Service and he had agreed to cooperate with the Secret Service. The court allowed this tape into evidence under Fed.R.Evid. 804(b)(5).

Ladd was convicted on both counts. He was sentenced to thirty months in prison on each count, to run concurrently. The court also ordered a period of three years of supervised release and a $50 special assessment on each count for a total of $100.

## II. ADMISSION OF THE BUFFINGTON TAPE—COUNT I

A brief review of the events surrounding the introduction of the tape is necessary. Prior to trial, the government informed Ladd that it would introduce the tape; at this time, it was, however, contemplated that Buffington would testify. After the jury was impaneled, the prosecutor told both the court and the defense attorney that in response to a government subpoena Buffington's attorney had told the prosecutor that Buffington would refuse to testify on fifth amendment grounds. At trial, the government sought to introduce the tape under Rule 804(b)(5).[5] The

5. Fed.R.Evid. 804(b)(5) states:

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

government did not produce Buffington nor did it introduce any other evidence which connected the tape to counterfeiting. The tape does not refer explicitly to counterfeiting; rather, it uses the term "funny stuff." The court allowed the tape into evidence over Ladd's objection. After it was played to the jury, the court commented:

> I don't like the idea that Buffington is not here, and that conversation was innocuous. Did this conversation add anything to this case? You just gave him an appeal case, and I don't think it was necessary. You should have looked at the transcript first.

We view the issue whether the district court properly admitted the Buffington tape under the residual hearsay exception as a close one, as indeed the district court recognized. To be admissible under Rule 804(b)(5), a hearsay statement must be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts."

This tape was offered as part of the government's evidence with respect to Ladd's possession of the currency sent to him in late 1986 and early 1987. Roston identified counterfeit bills that the government had seized from Buffington. Through the Buffington tape, the government attempted to demonstrate that Ladd was the intermediary. While somewhat probative on this point, Roston's own direct testimony on these matters, corroborated by the Roston–Ladd tape, appears substantially stronger. Ladd's taped conversation with Buffington is short, and its probativeness is further diminished by the speakers' veiled references to (presumably) counterfeit bills ("funny stuff"). There was no direct evidence that "funny stuff" actually meant counterfeit bills. Still, the jury might reasonably have understood the Buffington tape to concern counterfeiting. In addition, references to past transactions by Ladd may have been admissible as admissions by a party under Fed.R.Evid. 801(d)(2). And, of course, the decision of the trial judge is reversible only for abuse of discretion.

The panel members are divided on this issue. Whether or not the Buffington tape was admissible under Rule 804 is of no moment, however, if the admission was in any event harmless. *See, e.g., United States v. Medina–Gasca*, 739 F.2d 1451, 1454 (9th Cir.1984). In *United States v. Mateos–Sanchez*, 864 F.2d 232, 237 (1st Cir.1988), we set forth the harmless error test:

> In determining whether or not error was harmless, a reviewing court must assess the record as a whole to determine the probable impact of the improper evidence upon the jury. *United States v. Currier*, 821 F.2d 52, 56 (1st Cir.1987). "The prejudicial effect of the improper evidence must be weighed against the impact of the properly admitted evidence to determine whether or not the evidence complained of might have contributed to the conviction." *Id.* at 56–57.

The properly admitted evidence, outlined above, clearly proves Ladd's possession of counterfeit currency in late 1986 and early 1987. The innocuous nature of the Buffington tape neither added to nor detracted from the other overwhelming evidence pointing toward Ladd's guilt. The error in admitting the Buffington tape was harmless.[6]

---

*    *    *    *    *    *

**(5) Other exceptions.** A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

6. Ladd's argument that the improper admission of the tape was also a violation of his sixth

## III.  RECEIPT—COUNT II

■ Ladd attacks his conviction for receipt of counterfeit currency in November 1987 on the basis that he did not in fact receive it.  We start by noting that neither of the parties have cited, and we have been unable to locate, any case dealing with the definition of receipt under 18 U.S.C. § 473. We draw our analysis, therefore, from cases dealing with receipt in other contexts in the criminal law.

We turn first to cases involving receipt of a firearm.  In *Ball v. United States*, 470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985), the Supreme Court described the relationship between receipt and possession:

[P]roof of illegal receipt of a firearm *necessarily* includes proof of illegal possession of that weapon.  "[W]hen received, a firearm is necessarily possessed."  *United States v. Martin*, 732 F.2d 591, 592 (CA7 1984).[9]

*Id.* at 867, 105 S.Ct. at 1675 (emphasis in original).  The footnote reads:

[9] As the Government suggests, the converse may not be true.  For example, a felon may possess a firearm without having "received" it; he may have manufactured the gun himself.

*Id.* n. 9.  We have held:

To prove receipt it is not necessary to show that the defendant actually received the pistol since "receipt under 18 U.S.C. § 922(h)(1) may be shown circumstantially by proving possession...." *United States v. Craven*, 478 F.2d 1329, 1337 (6th Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 54, 38 L.Ed.2d 85 (1973), and possession can be either actual or constructive, exclusive or joint.  *United States v. Flores*, 679 F.2d 173, 177 (9th Cir.1982); *United States v. Alverson*, 666 F.2d 341, 345 (9th Cir.1982).  "Constructive possession exists when a person ... knowingly has the power and the

intention at a given time to exercise dominion and control over an object, either directly or through others."  *United States v. Craven*, 478 F.2d at 1333.  *See also United States v. Birmley*, 529 F.2d 103, 107 (6th Cir.1976); *United States v. Daniels*, 527 F.2d 1147, 1150 (6th Cir. 1975).

*United States v. Lamare*, 711 F.2d 3, 5 (1st Cir.1983); *see also United States v. Pelusio*, 725 F.2d 161, 167 (2d Cir.1983) (citing and quoting *Lamare*).  Similarly, other courts have considered possession a necessary element of receipt.  *See, e.g., United States v. Clark*, 741 F.2d 699, 703 (5th Cir.1984) ("knowingly taking possession"); *United States v. Martin*, 732 F.2d 591, 592 (7th Cir.1984) ("the offenses are the same."); *United States v. Griffin*, 705 F.2d 434, 437 (11th Cir.1983) (receipt "includes any knowing acceptance or taking of possession"); *United States v. Lipps*, 659 F.2d 960, 962 (9th Cir.1981) (per curiam) (same); *see generally*, Annotation, *What Constitutes Receipt of Firearm, Under 18 U.S.C. S. § 922(h), Prohibiting Certain Persons From Receiving Any Firearm Which Has Been Shipped Or Transported In Interstate Or Foreign Commerce*, 74 A.L.R. Fed. 486 (1983).

The Eighth Circuit has two lines of cases.  The first holds that receipt is distinct from possession but that possession is circumstantial evidence of prior receipt.  *See e.g., United States v. Goerlich*, 729 F.2d 1168, 1170 (8th Cir.1984) (per curiam); *United States v. Johnson*, 709 F.2d 515, 517 (8th Cir.1983).  The Eighth Circuit has also equated receipt with acquisition and held that "[i]t is not synonymous with a possession.  Time of receipt and venue must be proven as well."  *United States v. Winer*, 519 F.2d 256, 257 (8th Cir.1975) (per curiam); *see also United States v. Kelly*, 519 F.2d 251, 253 (8th Cir.1975).

The firearm cases, as we read them, show that receipt may be actual or con-

___

amendment to confrontation misconstrues the test for such violations.  The confrontation clause requires a showing that the declarant is unavailable and that the statement bears adequate indicia of reliability.  *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980); *United States v. Rengifo*, 789 F.2d 975,

984–85 (1st Cir.1986).  Because it was not contested, we have assumed unavailability.  Furthermore, at trial, the supervising Secret Service agent testified at length as to Buffington's cooperation, the conditions under which the tape was made, and its authenticity.  There were adequate indicia of reliability.

structive.[7] Constructive receipt can be shown circumstantially by proof of possession, either actual or constructive. But, as the Supreme Court noted, possession may be insufficient to prove receipt since one may possess an item without receiving it. *Ball,* 470 U.S. at 862 n. 9, 105 S.Ct. at 1672 n. 9.

In the receipt of stolen property cases, a different definition prevails: "[A]ccepting a good and having either physical control of or apparent legal power over a good is sufficient to show that an individual received it." *United States v. Strauss,* 678 F.2d 886, 894 (11th Cir.), *cert. denied,* 459 U.S. 911, 103 S.Ct. 218, 74 L.Ed.2d 173 (1982); *see also* LaFave & Scott, *Criminal Law* § 93 at p. 683 (1972) ("Actual manual possession is not required, however, for one may receive property when he exercises control over it, though he does not lay hands, or even eyes, upon it. . . ."). The district court based its formulation of "constructive receipt" on this definition. Quoting from *Strauss,* 678 F.2d at 894, the district court instructed the jury that "accepting a good and having either physical control of or apparent legal power over a good is sufficient to show that an individual received it." But, this definition is little more than acceptance plus possession, actual or constructive. "Physical control" of goods is actual possession, and "apparent legal power" can be equated with "dominion and control," which is the definition of constructive possession. Thus, both the firearms and stolen property definitions require actual or constructive possession to show constructive receipt.

We need not decide the exact contours of the definition of receipt in the context of § 473. In this case, there is no claim that Ladd took actual receipt of the package. And, to prove constructive receipt under any definition, the government must prove, at a minimum, possession, either actual or constructive. Here, the government's evidence failed to show possession of either type. Agent Hobson testified that the transaction was planned and executed in such a way as to prevent Ladd from ever having control over the package because the agents did not want to run the risk of Ladd fleeing with the counterfeit currency. On a prearranged signal, Ladd was arrested prior to ever touching the package. The government argues that Ladd's signing two receipts shows constructive possession. If anything, however, the manner in which they were signed points the other way. First, Ladd was handed a clipboard and told to sign on the line. Next, Agent Hobson tore a second receipt off the face of the package and put it on the clipboard for Ladd to sign. Hobson did not give the whole package to Ladd for signature and then tear off the second receipt because the Secret Service wanted to be sure that Ladd would never have control of the package. Under these circumstances, no reasonable observer (assuming that he was aware of the activities and intentions of the Secret Service agents) could have concluded that Ladd had any legal power over the package at the time that he signed for it. It would have been clear to any such informed observer that the package remained under the sole control of the Secret Service and that obtaining Ladd's signature on the receipts was a charade.

This case is not comparable to *Lamare,* 711 F.2d 3. In *Lamare,* the defendant was convicted of receipt of a firearm. The pistol was not owned by Lamare; rather, he used the gun as collateral to secure the release of his car from a towing company. Furthermore, he knew he could obtain the gun by paying the debt. *See id.* at 4–6. Thus, in *Lamare,* "[c]onstructive possession was conclusively established" because the defendant exercised control over the pistol by directing its movements and using it to his benefit. Here, by contrast, the Secret Service retained full control of the package so that there would be no possibility that Ladd could benefit from it.

## IV. OTHER ISSUES

■ Ladd raises three other issues with which we can deal briefly. First, he complains of certain remarks made by the prosecutor during the opening statement. The remarks concerned Roston's prior criminal

---

**7.** Although the cases do not specifically use the term "constructive receipt," such a label aptly fits any formulation of receipt which is not actual.

activities and the dye-removal experiments conducted by Roston and Ladd. Neither set of remarks was improper; evidence supporting both was introduced at trial. In particular, we cannot accept Ladd's characterization of the remarks concerning Roston's criminal history as improper vouching. The prosecutor stated that "[t]he government does not vouch for nor control Elsworth Roston." Furthermore, Roston's prior criminal history was the object of a lengthy cross-examination by Ladd, attacking Roston's credibility. The Fifth Circuit has aptly commented on this type of situation:

> The government was entitled to outline for the jury its expected evidence which included testimony by convicted co-conspirators; thus, the disclosure [about their guilty pleas and status as convicted co-conspirators] served a legitimate purpose.... Also, all defense counsel vigorously cross-examined the cooperating co-defendants about their guilty pleas; thus, most of the emphasis on the guilty pleas is attributable to defense counsel's cross-examination and not the government's opening statement.

*United States v. Magee,* 821 F.2d 234, 241 (5th Cir.1987). The refusal to declare a mistrial was not error.

Second, Ladd argues that the instruction on the effect of his failure to testify was incomplete. The judge gave the following instruction:

> The burden to prove he is guilty is on the government. He has no burden to prove he is not guilty. He has no burden to testify. He does not have to explain. He does not have to present any evidence. And the fact that the defendant does not do so cannot even be considered by you in arriving at your verdict.

Ladd argues that the instruction should also have included two additional concepts: (1) no inference of guilt can be drawn from Ladd's failure to testify; and (2) a defendant cannot be compelled to testify. *See Carter v. Kentucky,* 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981). Ladd's requested instruction tracked the instruction at issue in *Carter, id.* at 294, 101 S.Ct. at 1116. We do not, however, read *Carter* as requiring any exact wording for such an instruction. The issue in *Carter* was whether a state could prohibit an instruction such as the one requested. The Court held "that a state trial judge has the constitutional obligation, upon proper request, to minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify." *Id.* at 305, 101 S.Ct. at 1121–22; *see also James v. Kentucky,* 466 U.S. 341, 344, 104 S.Ct. 1830, 1833, 80 L.Ed.2d 346 (1984) ("In *Carter* we held that, in order fully to effectuate the right to remain silent, a trial judge must instruct the jury not to draw an adverse inference from the defendant's failure to testify if requested to do so."). The court's instruction in this case met this obligation.

Finally, Ladd argues that the cumulative effect of the errors in this case requires reversal though individually they might not. We have, however, found only two errors; one of those we found harmless and the other has resulted in a reversal of Ladd's conviction for receipt of counterfeit currency.

### CONCLUSION

The conviction on the possession count is affirmed; the conviction for receipt of counterfeit money is reversed and the sentence on that count shall be vacated.