**Ariel SANTIAGO, Petitioner, Appellant,**

v.

**UNITED STATES of America, Respondent, Appellee.**

No. 88–2064.

United States Court of Appeals, First Circuit.

Submitted Sept. 15, 1989.

Decided Nov. 20, 1989.

372

Ariel Santiago on brief pro se.

Daniel F. Lopez Romo, U.S. Atty., and Antonio R. Bazan, Asst. U.S. Atty., on brief for respondent, appellee.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

PER CURIAM.

Petitioner, Ariel Santiago, was convicted of (1) importing cocaine and (2) possessing cocaine with intent to distribute it. This conviction was affirmed on appeal. *United States v. Santiago*, 828 F.2d 866 (1st Cir. 1987), *cert. denied*, 485 U.S. 969, 108 S.Ct. 1244, 99 L.Ed.2d 442 (1988). He then filed a § 2255 petition making two challenges: 1) that the court erred in imposing a $10,-000 stand committed fine on petitioner, an indigent who had had court-appointed counsel at trial, and 2) that the evidence was insufficient to support a conviction for possession in that the cocaine had been the subject of a controlled delivery and had remained under the dominion of undercover government agents. Without specifically addressing either argument, the district court dismissed the petition. On appeal, petitioner reasserts the two arguments raised below and adds a third—that his fourth amendment rights were violated by the warrantless post arrest search of petitioner's and/or co-defendants' luggage and seizure therefrom of $8,368.61. We address each argument separately.

1. The stand committed fine.

On February 20, 1986, petitioner was sentenced to 8 years imprisonment and a $5000 fine on the importation count and 7 years imprisonment (to be served consecutively to the first term) and a $5,000 fine on the possession with intent to distribute

count. Petitioner was directed to stand committed until the fines were paid.

As petitioner pointed out in his § 2255 petition, he had court-appointed counsel at his trial and at sentencing, an indication that, at least at the time of sentencing, he was financially unable to pay the fines. He contended that he had remained unable to pay the fines, that nonpayment adversely affected his eligibility for parole, *see* 28 C.F.R. § 2.7(a) (1988) ("In any case in which a prisoner shall have had a fine imposed upon him by the committing court for which he is to stand committed until it is paid or until he is otherwise discharged according to law, such prisoner shall not be released on parole or mandatory release until payment of the fine, or until the fine commitment order is discharged according to law under the regulations of the Bureau of Prisons"), and that the adverse effect on parole eligibility caused by his indigence in the face of the stand committed fine amounted to an equal protection violation.

■ As petitioner points out, a person may not be incarcerated solely because of inability to pay a fine. *Tate v. Short*, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971); *Williams v. Illinois*, 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970). The record before us does not indicate whether petitioner presently has the ability to pay or likely would acquire such ability prior to the time petitioner otherwise might be eligible for parole, as the district court does not appear to have made any findings on the matter. *See United States v. Levy*, 865 F.2d 551, 560–61 (3d Cir.1989) (the preferable practice when a defendant is declared indigent is either to decline to impose a stand committed fine or to accompany such a fine with an explanation).

■ The government's sole response is that a § 2255 petition is not the proper vehicle for resolving petitioner's ability to pay the fine and that instead petitioner should file an affidavit with a magistrate. The government cites no authority and does not refer petitioner to any statute under which he should proceed. It appears, however, that 18 U.S.C. § 3569 may be the statute the government has in mind and that it, along with Bureau of Prison regulations, 28 C.F.R. §§ 571.50–571.56 (1988), provides a remedy for petitioner. The statute directs "a poor convict ... confined in prison ... solely for the ... nonpayment of ... fine" to apply to a "United States magistrate in the district where he is imprisoned setting forth his inability to pay such fine...."[1] The Bu-

1. 18 U.S.C. § 3569 reads in full as follows:

§ 3569. Discharge of indigent prisoner

When a poor convict, sentenced for violation of any law of the United States by any court established by enactment of Congress, to be imprisoned and pay a fine ... has been confined in prison, solely for the nonpayment of such fine ... such convict may make application in writing to the nearest United States magistrate in the district where he is imprisoned setting forth his inability to pay such fine ... and after notice to the district attorney of the United States, who may appear, offer evidence, and be heard, the magistrate shall proceed to hear and determine the matter.

If on examination it shall appear to him that such convict is unable to pay such fine, or fine and costs, and that he has not any property exceeding $20 in value, except such as is by law exempt from being taken on execution for debt, the magistrate shall administer to him the following oath: "I do solemnly swear that I have not any property, real or personal, exceeding $20, except such as is by law exempt from being taken on civil process for debt; and that I have no property in any way conveyed or concealed, or in any way disposed of, for my future use or benefit. So help me God." Upon taking such oath such convict shall be discharged; and the magistrate shall file with the institution in which the convict is confined, a certificate setting forth the facts. In case the convict is found by the magistrate to possess property valued at an amount in excess of said exemption, nevertheless, if the Attorney General finds that the retention by such convict of all such property is reasonably necessary for his support or that of his family, such convict shall be released without further imprisonment solely for the nonpayment of such fine, or fine and costs; or if he finds that the retention by such convict of any part of such property is reasonably necessary for his support or that of his family, such convict shall be released without further imprisonment solely for nonpayment of such fine or fine and costs upon payment on account of his fine and costs, of that portion of his property in excess of the amount found to be reasonably necessary for his support or that of his family.

reau of Prison regulations authorize a federal prisoner to apply either to the prison warden or a magistrate for a determination of inability to pay a committed fine and—unlike the statute—do not specifically state that imprisonment must be *solely* due to inability to pay before a determination of inability to pay is made.

In view of the apparent availability of these remedies tailored specifically to determining ability to pay, we see no reason why petitioner should be permitted at this time to pursue the matter under his § 2255 petition. *See United States v. Harris*, 727 F.2d 401, 406–07 (5th Cir.) (claim made on direct appeal that stand committed fine violates equal protection premature in view of administrative remedies), *cert. denied*, 469 U.S. 840, 105 S.Ct. 143, 83 L.Ed.2d 82 (1984); *United States v. Mack*, 655 F.2d 843, 846–47 (8th Cir.1981) (same, in context of § 2255 petition). Our disposition, however, is without prejudice to petitioner again seeking relief under § 2255 should he be able to point to some reason why the remedies under § 3569 and the Bureau of Prison regulations are inadequate.

### 2. Sufficiency of the evidence of possession.

■ Petitioner contends that the cocaine in question remained, realistically, at all times under the control of undercover government agents and that he never acquired sufficient control over it to be convicted of possession with intent to distribute. In addressing this argument, we rely for background on our summary of the evidence as set forth in *United States v. Santiago*, 828 F.2d 866, 867–68 (1st Cir. 1987):

> On November 9, 1985, a United States customs agent observed Manuel Flores disembarking from a cruise ship in San Juan, Puerto Rico. The agent, his suspicions aroused by the man's strange manner of walking, followed him and questioned him. The agent asked Flores to remove his shoes whereupon cocaine was discovered concealed in the insoles. Flores was arrested and searched, revealing a handwritten note which read "Dupont Plaza, Room 902."
>
> After questioning, Flores agreed to cooperate with the government in arranging a controlled delivery. He then accompanied undercover agents to the Dupont Plaza Hotel where they observed the occupants of Room 902 in the process of checking out. The occupants were later identified as defendants Ariel Santiago, Rosa Santiago, and Eugenia Osorio de Santiago.... The defendants, followed by the agents, proceeded to the Palace Hotel where they registered.
>
> About an hour later, the defendants left the hotel and went to the harbor area of San Juan. Flores and an undercover agent went and sat next to them. The agent made eye contact with Ariel and pointed to the sneakers he was wearing and then to Flores' shoes. The agent motioned "what do we do" and Ariel responded, "Palace Hotel." Ariel then asked Rosa for the room number, which she told him and he repeated to the agent.
>
> About an hour later the agent and Flores met Ariel at a cafeteria across from the Palace Hotel. Ariel signaled to the agent to continue on to the hotel. Once inside the room, the agent told Flores to give the defendants his shoes. Eugenia placed the shoes on a table without examining them. Rosa inquired whether Flores had brought an extra pair of shoes to which he replied in the negative. Rosa then told Ariel to go downstairs and buy Flores a pair of shoes and asked Flores his shoe size. Ariel moved towards the door, but the agent reached it first, opened it, turned around and yelled "federal agents."

While 18 U.S.C. § 3569 was repealed by Pub.L. No. 98–473, § 212(a)(2), 98 Stat.1987 (1984), the repeal was effective November 1, 1987 and applicable only to offenses committed after that date. *See* Pub.L. No. 98–473, § 235(a)(1), 98 Stat. 2031 (1984) as amended by Pub.L. No. 99–217, § 4, 99 Stat. 1728 (1985) and Pub.L. No. 100–182, § 2, 101 Stat. 1266 (1987). As petitioner's offense was committed prior to November 1, 1987, he appears to be able to invoke 18 U.S.C. § 3569. *See* 18 U.S.C.A. § 1569, 1989 Supp. at 36–43 (setting forth statutory provisions—including § 3569—applicable to offenses committed prior to November 1, 1987).

Other agents waiting outside entered the room and assisted in arresting the defendants. A search of the room revealed approximately $8,000 in cash."

To the above we add that there was evidence that inside the Palace Hotel room, Flores first handed the cocaine ladened shoes to petitioner, who then passed them on to Eugenia.

Petitioner relies mainly on *United States v. Batimana*, 623 F.2d 1366 (9th Cir.), *cert. denied*, 449 U.S. 1038, 101 S.Ct. 617, 66 L.Ed.2d 500 (1980). There, two defendants' convictions for possession of heroin with intent to distribute were reversed. The evidence was that co-defendant Nicanor had arranged for one Edgardo Lavadia to bring 500 grams of heroin from the Philippines to Los Angeles. Unknown to co-defendants, however, Lavadia had been arrested by Philippine police and had agreed to cooperate. Narcotics officers flew with Lavadia to Los Angeles. Nicanor and defendants met with Lavadia in a hotel room. The heroin was delivered to the room by a DEA agent. Lavadia took possession of the heroin and then, possibly (according to the concurring judge's opinion which indicated that Nicanor may have been physically holding the heroin at the time of arrest, *id.*, at 1371), handed it to Nicanor. Minutes later, defendants were arrested. In the brief interval between delivery and arrest, one defendant had tried to put his hand into the bag to taste the heroin. Neither defendant had had actual possession of the heroin. The court concluded that neither defendant had had constructive possession—which the court defined as " 'dominion and control ... so as to give power of disposal of the drug,' " *id.*, at 1369—either. The majority explained as follows:

> There is no evidence that appellants asserted dominion and control over the heroin. Indeed, the limited time span negates such an argument. Lavadia took possession of the package upon delivery.... Viewing the contents of the drug package does not indicate the requisite ability " 'to assure [its] production, without difficulty, to a customer.' "

*Id.*, at 1369. Nor, even on the assumption that Nicanor had briefly possessed the heroin, could defendants' conviction be sustained on an aiding and abetting theory as they had done nothing to effect or assist Nicanor's possession, the majority added. Defendants had been present at the Los Angeles airport as lookouts (when the heroin had been either in law enforcement officer's or informant Lavadia's possession) and present in the hotel room, one of them having locked the door after the heroin's delivery, but this presence and minor activity were insufficient, the majority concluded, "to satisfy the participation requirements for aiding and abetting the possession of heroin." *Id.*, at 1370.

The concurring judge had a somewhat different emphasis, concluding that even if Nicanor had had physical possession of the heroin, he could not properly have been found to have possessed the heroin within the meaning of the statute because of the tightly controlled nature of the delivery:

> This transaction was so tightly controlled by the police that Nicanor never had power to control the disposition of the drugs in any way. In such a circumstance, and despite the fact that he had the drugs in his physical possession, it cannot be said that he had possession of the drugs for purposes of section 841. Because the evidence was insufficient to convict Nicanor of possession, it is necessarily insufficient to support the convictions of [defendants].

*Id.*, at 1371.

Similarly, it can be argued, as petitioner does, that in view of the agents waiting outside the hotel room ready to make an arrest and the agent within the room, despite whatever brief handling of the cocaine may have taken place inside the hotel room, neither petitioner nor his co-defendants ever realistically had dominion or control sufficient to control the disposition of the cocaine in any significant way.

■ Apparently, petitioner would read *Batimana* as stating that possession requires an ability to dispose of the drugs, an ability which is negated if the presence of law enforcement officers makes it unlikely

that any such disposition would occur. It may be that in certain factual contexts an ability to dispose is critical to a finding of possession, but we reject the position that it always is. On this subject matter, we find the discussion in the majority opinion in *United States v. Martorano*, 709 F.2d 863 (3d Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983), instructive. The majority pointed out that the ninth circuit's "ability to dispose" element of constructive possession had originally been "developed and applied to determine the degree of [an] appellant's participation in crimes committed by others," *id.*, at 867–69, and flatly rejected the notion that an ability to dispose of the contraband in the sense of a likelihood of escaping from imminent arrest was necessary. *Id.*, 871. Other courts, too, have either expressly rejected the idea that ability to dispose is necessary to a conviction for possession, *United States v. Posner*, 868 F.2d 720, 722–24 (5th Cir.1989) (undercover DEA agent delivered van with marijuana to defendant's agent, gave agent the keys, then arrested agent as he attempted to start the van; possession passed when defendant's agent took the keys; opportunity to escape or actually distribute not necessary); *United States v. Toro*, 840 F.2d 1221, 1237–38 (5th Cir.1988) (defendant took actual possession of cocaine from undercover agent before being arrested shortly thereafter; possession does not require an opportunity to escape with the contraband); *United States v. Damsky*, 740 F.2d 134, 139 (2d Cir.) (defendant was in constructive possession of contraband once he acquired keys to vehicle; that the government never intended to let defendants depart does not negate possession), *cert. denied*, 469 U.S. 918, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984); *United States v. O'Connor*, 737 F.2d 814, 818–19 and n. 3 (9th Cir.1984) (rejecting position of concurring judge in *Batimana* that possession cannot be found in a tightly controlled delivery and concluding instead that "extensive government surveillance during the cocaine delivery and ... scant, if any, chance that the government supplied cocaine would find its way into distribution ... [has no] relevance to the posses-

sion issue"), *cert. denied*, 469 U.S. 1218, 105 S.Ct. 1198, 84 L.Ed.2d 343 (1985); *United States v. Jones*, 676 F.2d 327, 332 (8th Cir.) ("fact that the agents intended to arrest [defendant] and recover control of the marijuana does not negate the fact, that for however short a period of time, [defendant] was in actual control of the marijuana" as he transferred it from the agent's vehicle to his own), *cert. denied*, 459 U.S. 832, 103 S.Ct. 71, 74 L.Ed.2d 71 (1982), or have upheld possession convictions where the defendant's possession or control over contraband was momentary and fleeting since agents lay in wait to make an arrest. *United States v. Zandi*, 769 F.2d 229, 234–35 (4th Cir.1985) (defendants acquired constructive possession over opium shipped from Pakistan when they acquired actual possession of the shipping documents; that custom officials had discovered the opium and would not have finally released the package to defendants when they came to claim it did not defeat defendants' possession). In the present case, the informant had handed over his shoes to petitioner and his co-conspirators. Delivery had taken place. But for arrest, for all that appears, the cocaine would have remained in the conspirators' possession, at least until the next step of the transaction. We conclude that, for however briefly, petitioner, in conjunction with his co-defendants, had joint possession of the cocaine ladened shoes. That arrest precluded defendants from enjoying the fruits of that possession is irrelevant. This is not a case, such as our recent opinion in *United States v. Ladd*, 877 F.2d 1083 (1st Cir.1989), where the contraband never passed from the government agent's hands into the defendant's, and the defendant, even for a brief moment, had no control of the object.

In any event, we think *Batimana* is factually distinguishable from the present case. Delivery had not progressed as far in *Batimana* as in the present case. In *Batimana*, heroin had been brought to the room, but, for all that appears, further negotiating may have remained before Lavadia would have relinquished his dominion and control over the heroin. In the present case, in contrast, the drugs had been hand-

ed over to petitioner and his co-defendants. The informant had unequivocally given up his shoes, and petitioner was about to go buy him new shoes. Delivery was complete. In contrast to *Batimana*, the drugs had not only been brought to the room, but had been unambiguously turned over to petitioner and his cohorts. We find no merit to petitioner's claim of insufficient evidence.

■ Petitioner also contends that he simply took orders from Eugenia and Rosa, who, if anyone, would have had the actual power to control or dispose of the cocaine. In other words, petitioner contends he was simply an underling whom the principals never entrusted with possession, whether actual or constructive, of the cocaine. We disagree. The evidence showed petitioner actively doing what was necessary to get Flores to the hotel room and obtain the cocaine and did not require a finding that petitioner occupied some minimal, subservient role. Similarly, petitioner's contention that the evidence was insufficient to show that he knew the shoes contained contraband is meritless. Petitioner's directing agent Torres, a stranger, to a hotel room after Torres had merely pointed to his and Flores' shoes and motioned what to do is more than sufficient evidence that petitioner knew full well enough the nature of the shoes' cargo.

3. Warrantless search of luggage.

Petitioner challenges a warrantless post arrest search of luggage, seizure therefrom of $8,368.61, and introduction into evidence of the money at trial. These matters were not presented in the § 2255 petition. We will not address something raised for the first time on appeal.[2] To the extent petitioner is challenging a post arrest inventory search at the Customs House, we already addressed and upheld that search in *United States v. Santiago*, 828 F.2d at 869–70, and hence the matter will not be

reviewed again. *Dirring v. United States*, 370 F.2d 862, 864 (1st Cir.1967).

The judgment of the district court is *affirmed*.

---

**2.** Similarly, to the extent petitioner raises new issues in his reply brief, we will not address them.

