TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00253-CR






Charles Hill, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT

NO. D-1-DC-07-205322, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 A jury convicted Charles Hill of the offense of possessing a controlled substance
(cocaine) in an amount of less than one gram. See Tex. Health & Safety Code Ann. § 481.002(38)
(West Supp. 2008), § 481.115 (West 2003). Punishment was assessed at imprisonment for nine
years and one day, plus a $10,000 fine. In two points of error, Hill challenges the legal and factual
sufficiency of the evidence. We will affirm the judgment.


BACKGROUND

 The jury heard evidence that, on the night of September 7, 2007, Hill agreed to
purchase crack cocaine from an undercover officer in the Austin Police Department, who was
posing as a drug dealer. The undercover operation took place in the area of 13th Street and Chicon
in Austin. The undercover officer explained that he was approached by Hill, who asked the officer
"for $5 worth of crack." The officer told Hill that he had to purchase at least ten dollars worth of
crack cocaine. According to the officer, Hill agreed. The officer recounted what happened next:


At that point I went to a vehicle, which is a minivan, and I opened the door and I
acted as if I was getting something out of the van. . . . I reached in my pocket and
pulled out one rock [of crack cocaine], put the rest of it back in my pocket and I
turned to Mr. Hill and told him okay, where is my money. He showed me a wad of
cash and I gave him the crack cocaine and I gave the predetermined bust signal,
which is 'good deal.'



When asked how he gave Hill the cocaine, the officer testified, "I put the rock in his hand."

 After the undercover officer gave the bust signal, a team of "takedown" officers
"jumped out of the van" and grabbed Hill. The officers and Hill fell to the ground, along with the
cocaine. The undercover officer testified that he did not remember if Hill threw the drugs on the
ground or if they just fell to the ground. According to the officer, it was typical for the drugs in
undercover busts to end up on the ground "on every single arrest." The undercover officer retrieved
the cocaine, and Hill was taken into custody. The officer could not recall whether the rock was
"right at [Hill's] feet or [Hill's] hand" when Hill was on the ground, nor the distance between Hill
and the cocaine.

 A videotaped recording of the transaction and bust was admitted into evidence
and played for the jury. (1) However, because of the poor video quality of the recording, it is difficult
to discern images beyond, as the State observes, "silhouettes and some movement." (2) The officer
admitted that the video "doesn't show the hand-to-hand very clearly, but you can hear the audio and
you can see Mr. Hill as he begins to walk away." On the recording, one person can be heard asking
another, "You ain't no law, are you?" The other person responds, "No, I'm a Hill, baby." Then, the
recording appears to show the exchange and "takedown" occurring. The undercover officer narrated
the recording as it was being played for the jury:


The last part I handed him the crack cocaine in exchange for the money and just
before that I asked him, 'So, where is my money?' I don't know if you could hear
it very well, but I said where is my money, and at that point I saw he had a wad of
cash in his hand. I handed him the crack cocaine, he gave me the money pretty much
the same time, and I said good deal. I said it twice.



The officer could not tell from the recording how much time had elapsed between him giving the
bust signal and the takedown officers seizing Hill, but he testified that "[i]t looks like it could have
been a couple of seconds."

 The jury also heard testimony from Officer Anthony Nelson of the Austin Police
Department. Officer Nelson was monitoring the operation in a police SUV across the street. He
testified that he observed a "hand-to-hand transaction" between Hill and the undercover officer. 
When asked what he meant by "hand-to-hand transaction," Nelson explained, "It's most common
for people who traffic narcotics to quickly go from my hand to yours, my hand to yours. If you have
money, I want your money, you want my drugs. It's my hand to yours. That's commonly known
as hand to hand." When asked if he saw something from the undercover officer's hands go to the
suspect's hands, Nelson testified, "Yeah, what I saw was what looked like an exchange. It didn't
appear [as] if they were shaking hands or hey, I haven't seen you since Thanksgiving kind of thing. 
It looked like a transaction, a hand to hand."

 On the night of Hill's arrest, Detective Jason Bryant of the Austin Police Department
was in charge of the narcotics portion of the undercover operation. Detective Bryant testified
about how these operations are typically conducted. He explained that, whenever undercover
officers make a sale, "they give a predetermined bust signal and probably within two to three seconds
of the transfer going down the subject is grabbed." Bryant added that the undercover officers
are instructed not to give the signal "until the deal is made." A "deal is made," according to Bryant,
when the subject is "in possession of the controlled substance."

 Ralph Salazar, a forensic scientist with the Austin Police Department, analyzed
the substance that Hill was alleged to have possessed. Salazar testified that he determined that the
substance was crack cocaine and that it weighed 0.30 grams.

 Hill's sister, Joyce, testified for the defense. Joyce testified that, on the night her
brother was arrested, she was standing on the corner of 13th Street and Chicon, waiting for a friend
to arrive. She claimed that, as she was waiting, Hill pulled up in his car, parked on the street, got
out of the car, and asked her if she needed a ride. According to Joyce, before she could accept, a
person whom Joyce believed to be a police officer approached them, told Joyce that she "wasn't
going to get a ride tonight," and led Hill away to a minivan across the street. Joyce explained,
"There was a van. The police was in the van, yes, sir. The police had came across the street and
drugged my brother damned near across the street then slammed him on the ground." Joyce added,
"[T]hey slugged him, they body slammed him down on the ground real hard." Meanwhile, Joyce
testified, another police officer was "holding [her] down" and preventing her from approaching her
brother. Then, according to Joyce, the officers placed Hill in a patrol car and told Joyce to "get away
from there right now" or they would take her to jail "for interfering in the police work." When asked
if she saw Hill and the officer "do anything else," Joyce testified,


No, sir. He didn't hand him no type of drugs. He did not hand them no type of
money or no exchange and no action or no contact of weapon. I was really looking
at that part. I was wondering why they would be dragging him, just made him go
across the street. He was trying to talk to me but the man just came from the other
side of the street and practically pulled him over there and make him buy drugs.



On cross-examination, the State elicited the following testimony from Joyce:


Q: Have you ever been convicted of a felony or crime of moral turpitude in the
last ten years?


A: Yes, sir. Right now I have been entrapped myself for selling drugs to an
undercover law. I am fixing to do time right now for that.


Q: For delivering a controlled substance?


A: Yes, sir, it wasn't a real drug but it was related to a drug they said.


Q: That's what you said you are going to the state jail for?


A: Exactly. I got six months time for that.


. . . .


Q: Weren't you--if your brother were to say he was actually there to buy crack
cocaine, would you be surprised by that?


A: I wouldn't be surprised.


Joyce also admitted that she had been smoking crack cocaine on the night her brother was arrested,
but insisted that the effects of the drug lasted "maybe about two or three minutes" and that she
was "real sober" by the time her brother was arrested.

 Hill also testified in his defense. Hill explained that, when he got out of his car to talk
to his sister, the undercover officer walked over to them and "solicited" Hill. Hill testified that the
officer asked him, "What are you looking for?" Then, according to Hill,


[The undercover officer] said walk with me, so we walked across the street. As we
crossed the curb, he switched his cap around. By the time we get to the van, I had $9
in my hand. He snatched the $9 out of my hand, got the keys out of the pocket and
opened the trunk door. By then he reached over to hand me some. By then about
five cops toppled me to the ground. I never had possession of nothing.



However, Hill admitted that he had been trying to buy crack cocaine on the night he was arrested. 
He claimed that he was buying it for a friend, Angie Washington, whom Hill claimed was in his car
when he was arrested. Hill testified, "I ain't going to deny it, I had $9 that day and I did try to buy
some but I never even possessed the drugs." Hill also claimed that the police were "flat out lying," 
that the images and voices on the video recording were not him. Hill further admitted that he had
been smoking crack during the morning of his arrest, but could not recall how much. Additionally,
Hill admitted to being convicted for prior felony offenses, including theft in 2006, unauthorized
use of a motor vehicle in 2005, burglary of a habitation in 2003, and possession of a controlled
substance in 2000.

 The jury found Hill guilty. After finding the enhancement paragraphs alleged in the
indictment to be true, the jury sentenced Hill to imprisonment for nine years and one day and
imposed a fine of $10,000. This appeal followed.


STANDARD OF REVIEW

 In a legal sufficiency review, we consider whether, after viewing the evidence in
the light most favorable to the verdict, a rational trier of fact could have found the elements of
the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 324 (1979); Clayton
v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "This standard accounts for the factfinder's
duty 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences
from basic facts to ultimate facts.'" Clayton, 235 S.W.3d at 778 (quoting Jackson, 443 U.S. at 319). 
It is not necessary that every fact point directly and independently to the defendant's guilt, but it is
enough if the conclusion is warranted by the combined and cumulative force of all the incriminating
circumstances. Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

 In a factual sufficiency review, we consider whether, after viewing the evidence in
a neutral light, a rational trier of fact was justified in finding guilt beyond a reasonable doubt. See
Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We "must be cognizant of the fact
that a jury has already passed on the facts and must give due deference to the determinations of the
jury." Lancon v. State, 253 S.W.3d 699, 704-05 (Tex. Crim. App. 2008). "A verdict should be set
aside only if the evidence supporting the verdict is so weak as to render the verdict clearly wrong
or manifestly unjust." Id. at 705; Korell v. State, 253 S.W.3d 405, 412 (Tex. App.--Austin 2008,
pet. ref'd). Therefore, we will not reverse a case on a factual sufficiency challenge unless we can
say, with some objective basis in the record, that the great weight and preponderance of the evidence
contradicts the verdict. Watson, 204 S.W.3d at 417.


ANALYSIS

 To establish the offense of possession of a controlled substance, the State must prove
that: (1) the accused exercised actual care, custody, control, or management over the contraband;
and (2) the accused knew the matter possessed was contraband. See Tex. Health & Safety Code
Ann. §§ 481.002(38), 481.115(a); Evans v. State, 202 S.W.3d 158, 161 (Tex. Crim. App. 2006). Hill
contests only the first element, arguing that the evidence is legally and factually insufficient to prove
that he had "secured the rock to his actual care, custody, control, or management before he was
arrested by the takedown team." In other words, according to Hill, the officers seized him before
he was able to take possession of the drugs.

 The duration or length of time contraband is under a person's control does not alone
determine whether that person possessed the contraband. See Brewer v. State, 500 S.W.2d 504, 506
(Tex. Crim. App. 1973). Hill acknowledges this rule, but asserts that the "touching of an item
for less than one second should not equate to possession." According to Hill, the rock "had been
placed in appellant's hand by the officer as it simultaneously fell to the ground during the takedown." 
In Hill's view, because there was no evidence presented that he was "about to leave with the
contraband" prior to being arrested, the State failed to prove that he exercised actual care, custody,
control, or management of the drugs.

 Hill does not cite to any Texas authority to support this argument. Instead, Hill relies
solely on United States v. Kitchen, 57 F.3d 516 (7th Cir. 1995). (3) In Kitchen, the defendant sought
to purchase cocaine from a police informant. Id. at 519. The informant--who was accompanied by
an undercover police officer posing as a drug trafficker--met Kitchen and Kitchen's friend at a pre-arranged location. During the meeting, Kitchen produced envelopes containing $14,000 in cash. 
Id. However, instead of transferring the cash to the officer, Kitchen left the cash with his friend,
while he and the undercover officer traveled to a separate location "to check the merchandise." Id. 
At this location, another undercover officer was waiting with two kilograms of cocaine in the trunk
of his car. Id. When the three men met at this location, the undercover officer opened his trunk,
inside of which was a white garbage bag. Id. One of the officers opened the bag, revealing two
packages of cocaine. Id. At trial, Kitchen claimed that he never touched the cocaine, while the
undercover officers testified that Kitchen had picked up one of the kilograms of cocaine for "two or
three seconds." Id. Whether or not Kitchen touched the cocaine, it was undisputed that Kitchen
expressed concerns about the cocaine's "purity." Id. At that point, the officers placed Kitchen under
arrest. Id. Kitchen was subsequently convicted of the offense of possession of cocaine with intent
to distribute. Id. at 518.

 On appeal, Kitchen argued that the evidence was insufficient to prove that he had
possessed the cocaine. Id. at 520. The appeals court--although concluding that "the issue is a close
one"--agreed. Id. at 521. Viewing the evidence in the light most favorable to the verdict--i.e.,
that Kitchen picked up the cocaine for "two to three seconds"--the court examined whether such
a momentary handling of the contraband constituted possession in that case. See id. at 521 n.1. The
court held that it did not. Id. at 525. According to the appeals court, the record was "devoid
of evidence that Kitchen intended to walk away with the narcotics or otherwise transport them." Id.
at 522. The court added that this fact "might not be dispositive if the record revealed any evidence
that Kitchen had completed the sale or indicated some sort of unequivocal agreement to complete
the drug transaction." Id. If such evidence existed, the appeals court explained, "perhaps a
momentary holding, without more, would be sufficient to demonstrate actual possession. But that
is not the case before us now." Id. The appeals court concluded,


There simply is no evidence--such as payment of the purchase price or verbal
agreement--that the drug transaction was in any sense certain or complete. We
believe that although Kitchen held the drugs for a moment, he neither controlled
them nor had recognized authority over them. His conduct was consistent with
inspection--but nothing more. Lack of control is dispositive under both the doctrines
of actual and constructive possession. We therefore find the evidence insufficient to
support Kitchen's conviction for possession of cocaine.



Id. at 525. However, the court emphasized that its holding was limited to the unique facts of
the case:


We do not attempt to use the present case to formulate a rule workable for all
circumstances. Nor, by focusing on the incomplete nature of the narcotics deal here,
do we wish to suggest that all drug transactions must be 'complete' in order to later
establish possession at trial. Of necessity, the particulars of a given drug transaction
will drive the determination that a certain aspect of the defendant's conduct is
unequivocal enough to establish possession. But here, nothing in the record
convinces us that Kitchen's momentary holding constitutes possession of the drugs.
Money had not yet changed hands, and Kitchen had not otherwise assented to the
deal.



Id. at 523.

 We are unpersuaded that the rationale of Kitchen extends to this case. In Kitchen, "no
transaction occurred." Id. Kitchen did not tender the purchase money to the officers or otherwise
agree to buy the drugs. Instead, the evidence showed that, at most, Kitchen merely inspected the
drugs and expressed concerns about their "purity." In this case, however, the jury heard evidence
that, in a "hand-to-hand transaction," Hill and the undercover officer exchanged drugs and cash "at
pretty much the same time." The officer testified that, as he gave Hill a rock of crack cocaine, Hill
handed the undercover officer the purchase money. Another officer confirmed that he observed this
"hand-to-hand transaction" occur. Thus, unlike in Kitchen, there was evidence in this case that Hill
and the undercover officer "completed the sale."

 Furthermore, we find the court's reasoning in Kitchen at odds with the line of
Texas cases holding that a jury can find the element of possession regardless of how briefly a
defendant handles the contraband. See, e.g., Brewer, 500 S.W.2d at 506 (finding evidence sufficient
to prove possession of marihuana even though defendant took joint from witness, held onto it "for
about a minute," did not smoke it, and gave it back to witness); Reed v. State, 472 S.W.2d 757, 758
(Tex. Crim. App. 1971) (finding evidence sufficient to prove possession of controlled substance even
though defendant was arrested immediately upon purchase of illegal prescription at drug store);
Sutton v. State, 343 S.W.2d 452, 454 (Tex. Crim. App. 1961) (finding evidence sufficient to prove
possession of heroin even though defendant handled drugs for approximately 25 seconds); Hawkins
v. State, 214 S.W.3d 668, 670 (Tex. App.--Waco 2007, no pet.) (in theft case, finding evidence
sufficient to show that defendant exercised control over stolen property even though defendant
dropped property immediately after he was caught lifting it); Reynolds v. State, 981 S.W.2d 926 
(Tex. App.--Houston [1st Dist.] 1998, no pet.) (in possession-of-cocaine case, finding evidence
sufficient to show that defendant exercised control over bag of cocaine even though defendant
dropped bag on hotel bed immediately after taking it from undercover officer and looking inside
bag). Hill cites to no Texas case that follows Kitchen and we are not aware of one.

 Additionally, other federal courts, including the Fifth Circuit, have rejected arguments
similar to the one Hill advances. For example, in United States v. Toro, a federal agent delivered
cocaine to the defendant in a parking lot. 840 F.2d 1221, 1230 (5th Cir. 1988). The defendant
put the cocaine into his briefcase and was immediately arrested. Id. He was subsequently convicted
of the offense of possession of cocaine with intent to distribute. Id. The defendant argued that the
evidence was insufficient to prove possession because (1) the federal agent maintained dominion
over the cocaine up until the time of delivery; and (2) the presence of numerous agents at the arrest
site precluded the possibility that the defendant would ever leave the parking lot or do anything with
the cocaine prior to being arrested. Id. at 1237. The Fifth Circuit rejected these arguments:


Although the resulting arrest immediately thereafter terminated [the defendant's]
brief dominion over the cocaine, that does not mean that dominion sufficient to
justify conviction in a reasonable juror's mind never existed. To hold otherwise
would require us to define 'possession' in a manner that affords [the defendant] an
opportunity to escape with the contraband. That we decline to do. Such a definition
would defy common sense, place an impossible burden on police, and contribute to
the very evil that the violated statute intended to eliminate.



Id. at 1237-38; see also Santiago v. United States, 889 F.2d 371, 376 (1st Cir. 1989) (finding that,
once informant "handed over" contraband to defendant, "delivery had taken place" and defendant
had possession of contraband); United States v. Martorano, 709 F.2d 863, 871(3rd Cir. 1983)
(holding that law enforcement officers should not be required to allow suspect time to escape prior
to arresting suspect for possession); United States v. Jones, 676 F.2d 327, 332 (8th Cir. 1982) ("The
fact that the agents intended to arrest [the defendant] and recover control of the marijuana does not
negate the fact that, for however short a period of time, [the defendant] was in actual control of
the marijuana.").

 We agree with the reasoning of these other federal courts of appeals. The amount of
time that a defendant handles a controlled substance does not alone control whether or not the
defendant exercised actual care, custody, control, or management of the substance. In this case,
the evidence supporting the jury's finding that Hill exercised actual care, custody, control, or
management of the contraband includes the following:



 The undercover officer testified that Hill, after asking the officer "for $5 worth of crack," agreed
to purchase at least "ten dollars worth" of crack cocaine.


 


 The officer testified that he handed Hill the crack cocaine at "pretty much the same time" as Hill
gave the officer the money. The officer further testified that the rock was in Hill's hand.

 Officer Nelson testified that he witnessed the transaction, and he observed "what looked like an
exchange" or a "hand-to-hand transaction."

 Detective Bryant testified that, whenever undercover officers make a sale, "they give a
predetermined bust signal and probably within two to three seconds of the transfer going down
the subject is grabbed." Bryant added that the undercover officers are instructed not to give the
signal "until the deal is made." A "deal is made," according to Bryant, when the subject is "in
possession of the controlled substance."

 On the videotape recording of the transaction, the voices of two individuals can be heard
discussing a drug deal. One of these voices, the person wanting to purchase the drugs, identifies
himself by saying, "I'm a Hill." Shortly thereafter, the other voice says, "Good deal." The
recording then shows the person who agreed to purchase the drugs being arrested.




 Viewing the above evidence in the light most favorable to the verdict, we conclude
that the evidence is legally sufficient to support the jury's finding that Hill exercised actual
care, custody, control, or management over the contraband. The undercover officer testified that
he gave Hill the drugs as Hill gave him the money. Furthermore, Officer Nelson testified that he
observed what appeared to be an exchange or a "hand-to-hand transaction" between Hill and the
officer. The jury could reasonably infer from the testimony of the undercover officer and Nelson
that Hill had completed a purchase of the cocaine and that the drugs were in Hill's hand prior
to the arrest. Furthermore, voices on the video recording, including one person who identifies
himself as "a Hill," can be heard transacting a drug deal. At the conclusion of the transaction, a
voice can be heard saying, "Good deal." This phrase, according to the testimony of the police
officers, is a "predetermined bust signal" that is given only when "a deal is made" and the suspect
is "in possession of the controlled substance." The jury could reasonably infer from the voices on
the recording and the corresponding testimony that the person heard on the recording purchasing the
drugs was Hill and, because the bust signal had been given, that the drug deal had been completed. 

 When considering the above evidence in a neutral light, we also conclude that the
evidence is factually sufficient to support Hill's conviction. Although the exchange cannot be clearly
seen on the recording, two people can be seen and heard conducting some sort of drug deal. Thus,
contrary to Hill's assertion, the recording is not "demonstrative evidence reflecting appellant did
not commit the indicted offense." Rather, at worst, the recording fails to establish that Hill and not
someone else committed the offense, at least in the absence of other evidence identifying Hill as the
person on the tape. When the recording is considered with other evidence in the case, particularly
the testimony of the undercover officer, a jury could reasonably infer from that evidence that Hill
committed the offense. Hill also observes that the cocaine was not found on his person when he was
arrested. However, the undercover officer testified that the drugs end up on the ground "on every
single arrest." It was not irrational for the jury to find that, because of the physical nature of the
"takedown," Hill had possession of the cocaine prior to the arrest, but he dropped the cocaine on the
ground during the arrest. As for the testimony of Hill and his sister denying that an exchange
occurred, the jury was the sole judge of the credibility of the witnesses. Evidence was presented
that Hill had prior felony convictions and that Joyce had been using crack cocaine on the night she
claimed to have witnessed her brother being arrested. We find nothing irrational about the jury's
decision to disbelieve the testimony of Hill and his sister and believe the testimony of the police
officers. We cannot say, with some objective basis in the record, that the great weight and
preponderance of the evidence contradicts the jury's finding that Hill possessed the cocaine.

 We overrule Hill's points of error.





CONCLUSION

 We affirm the judgment of the district court.



 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed: February 6, 2009

Do Not Publish

1. Another officer in a police SUV across the street from the minivan had recorded the
transaction with a handheld camera.
2. According to the undercover officer, "It's hard to see on the video because it's taken at
night by a camera that doesn't have night vision." Another officer testified that the vehicle from
which the recording was made had tinted windows.
3. We are not, strictly speaking, bound by the decisions of the federal appeals courts. See
Reynolds v. State, 4 S.W.3d 13, 21 n.17 (Tex. Crim. App. 1999); Stewart v. State, 686 S.W.2d 118,
121 (Tex. Crim. App. 1984); Pruett v. State, 463 S.W.2d 191, 194 (Tex. Crim. App. 1971). 
However, because the Texas Controlled Substances Act is patterned after the federal narcotics
statute, see Act of May 28, 1973, 63rd Leg., R.S., ch. 429, § 1.02, 1973 Tex. Gen. Laws 1132, 1133
(current version at Tex. Health & Safety Code Ann. § 481.002(18) (West Supp. 2008)), we may look
to federal caselaw for guidance. See Reynolds v. State, 981 S.W.2d 926, 928 (Tex. App.--Houston
[1st Dist.] 1998, no pet.); Jimenez v. State, 739 S.W.2d 499, 503 (Tex. App.--Corpus Christi 1987,
pet. ref'd).