**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Isiah KITCHEN, Defendant–Appellant.**

No. 93–1828.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 16, 1995.

Decided June 7, 1995.

Rehearing Denied July 27, 1995.

William R. Hogan, Asst. U.S. Atty., Jonathan King (argued), Office of U.S. Atty., Crim. Div., Chicago, IL, for plaintiff-appellee.

Robert J. Raab, Barnett & Raab, Skokie, IL, Jack P. Rimland (argued), Michael J. Barton, Chicago, IL, for defendant-appellant.

Before CUMMINGS, CUDAHY and ROVNER, Circuit Judges.

CUDAHY, Circuit Judge.

Isiah Kitchen was associated with the El Rukn street gang. For activities arising out of that association, a grand jury charged Kitchen with the possession of cocaine with intent to distribute and with the possession of firearms by a felon. A jury convicted Kitchen of both offenses. Kitchen appeals, suggesting that the evidence is insufficient to support either conviction. We accept the jury verdict as to the conviction for the pos-

session of the firearm. We believe, however, that the evidence was insufficient to support the conviction for the possession of cocaine. We therefore affirm in part and reverse in part.

## I.

The police arrested Isiah Kitchen as part of an undercover narcotics operation. In March, 1989, undercover agents posing as drug dealers apprehended him during the course of a sale—also termed a "reverse buy"—of cocaine. Later that day, federal agents recovered two firearms from the house that Kitchen shared with his girlfriend. These events form the basis for Kitchen's convictions.

The specifics of the reverse buy are largely undisputed. The government engineered the setup by contacting Lawrence Griffin, a long-time acquaintance of Kitchen and an associate of the El Rukn street gang. Griffin was, at that time, incarcerated at the Cook County Jail. Griffin and Kitchen had several discussions over a three-month period. A number of these discussions proved to be fruitless, ultimately failing to result in a scheduled transaction. Griffin and Kitchen stayed in touch, however, with Kitchen able to page Griffin (actually federal agents) at a number Griffin had provided. Finally, Griffin and Kitchen agreed to a sale. Griffin told Kitchen that he would be released from prison soon, and that at that time, he would be able to deal narcotics. After further negotiations, Kitchen agreed to purchase two kilograms of cocaine from Griffin. The parties decided to transact the deal the next day for a total price of $28,000. Kitchen was to bring $14,-000 to the deal, with Griffin "fronting" him the remainder of the cocaine for payment at a later date.

The next day, authorities removed Griffin from prison for the purpose of conducting the transaction. Griffin telephoned Kitchen. The two men agreed to meet at Montrose Harbor at 3:00 p.m. that afternoon. At the scheduled time, Griffin traveled to the Harbor with Special Agent Michael Casali, who was posing as a drug trafficker. Griffin and Casali waited for Kitchen to arrive. Kitchen arrived with an individual named Kenneth Dowdell and parked his car behind the undercover vehicle. Griffin and Casali entered Kitchen's vehicle. At that point, Kitchen and Dowdell produced $14,000 in cash in a series of envelopes. Kitchen left the cash with Dowdell and accompanied Casali to the location of the cocaine in order to "check the merchandise." Griffin and Dowdell stayed with the cash in Kitchen's vehicle. Another special agent, Eduardo Fernandez (Fernandez), was waiting at a different location with two kilograms of cocaine in the trunk of his car.

Casali and Kitchen pulled up to the right of Fernandez's car. The three men then met at the rear of that car, where Fernandez had popped the hatchback. A white garbage bag containing two kilograms of cocaine sat in the trunk. One of the agents opened the bag to reveal two packages of cocaine. The parties dispute exactly what happened next. Kitchen contends that he never touched the cocaine. The government suggests that Kitchen picked up one of the kilograms of cocaine for "two or three seconds." All agree that Kitchen made a comment expressing concern about the drug's purity—that he was worried about "slabs" (apparently one of the most desirable forms of cocaine). At that point, Casali and Fernandez placed Kitchen under arrest.

Following the arrest, agents served a search warrant on Mary Williams's residence in Chicago. The search uncovered a fully loaded .357 magnum revolver and a .9 millimeter semiautomatic handgun. Both weapons were found in a bedroom on the first floor of the residence. The .357 magnum was discovered in the bed area, leaning up against the back of the headboard. The .9 millimeter was recovered from a dresser drawer along with an additional magazine of ammunition.

In the same bedroom, agents found both men's and women's clothing, shoes and toiletries. They also found miscellaneous papers and invoices bearing the name "Ike Kitchen." Among these papers were some containing handwritten numerical figures like those on papers seized from Dowdell at the scene of the arrest. In addition, agents located a gold

bracelet with Kitchen's El Rukn nickname lying on the dresser.

Whether Kitchen actually lived with Williams is the subject of some dispute. Kitchen claims to have been residing with his mother in Robbins, Illinois. He denies living with Williams and suggests that he only stayed overnight with her occasionally. The government points to evidence of Kitchen's presence at Williams's house. Kitchen apparently gave Williams's telephone number to Griffin, and was observed at Williams's address on a number of occasions. In addition, the government suggests that Kitchen was responsible for $10,000 worth of repairs on Williams's basement.

The jury ultimately found the government's version of events credible. They found Kitchen guilty of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), and of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Kitchen appeals, suggesting that the evidence was insufficient to support both determinations.

## II.

■ A defendant challenging the sufficiency of the evidence supporting a jury's verdict bears a "heavy burden." *United States v. Olson,* 978 F.2d 1472, 1478 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1614, 123 L.Ed.2d 174 (1993). Both the evidence and all of the reasonable inferences that can be drawn from the evidence are viewed in the light most favorable to the government. *United States v. Garrett,* 903 F.2d 1105, 1109 (7th Cir.), *cert. denied,* 498 U.S. 905, 111 S.Ct. 272, 112 L.Ed.2d 227 (1990). After applying this standard, we must uphold the verdict if a rational trier of fact could have found the existence of each element of the crime beyond a reasonable doubt. *Id.* Here, Kitchen mounts challenges to both counts of his conviction—that for possession of cocaine and that for possession of a firearm. He suggests, particularly, that the element of possession was not established in either case.

■ To convict Kitchen of the unlawful possession of a firearm by a felon, the gov-

ernment had the burden of proving: (1) that he had a previous felony conviction, (2) that he possessed a firearm and (3) that the firearm had traveled in or affected interstate commerce. *See* 18 U.S.C. § 922(g)(1); *Garrett,* 903 F.2d at 1110; *United States v. Petitjean,* 883 F.2d 1341, 1347 (7th Cir.1989). Kitchen does not contest the first and third elements of his conviction, but he does contend that evidence supporting the second element is lacking.

■ Possession may be either actual or constructive. *Garrett,* 903 F.2d at 1110 (citing *United States v. Taylor,* 728 F.2d 864, 868 (7th Cir.1984)). This means, essentially, that possession as an element of the crime can be established despite the fact that the firearm was not in the immediate possession or control of the defendant. *See id.* In *Garrett,* we noted:

Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others....

903 F.2d at 1110.

Under the doctrine of constructive possession, the jury could have determined that Kitchen possessed the weapons. The evidence adduced at trial suggested that Kitchen was something more than a casual visitor at Williams's home. In many of the recorded drug conversations with Kitchen, agents had reached him by calling the telephone number at that address. According to the government, Kitchen had stated that he lived at that address. Agents in fact saw Kitchen at that address on numerous occasions. The search revealed, in addition to the firearms, a number of Kitchen's possessions—his El Rukn bracelet, bills and papers bearing his name and various articles of men's clothing. Finally, the government also came forward with evidence suggesting that Kitchen had spent about $10,000 on repairs to Williams's basement. Kitchen argues that he in fact lived with his mother in Robbins, Illinois, and only visited Williams occasionally. But the jury was under no obligation to accept his testimony on this point. It could have in-

stead concluded that Kitchen shared the residence with Williams.

■ Such a conclusion supports the determination that Kitchen constructively possessed the handguns found at the residence. "Constructive possession can be established by a showing that the firearm was seized at the defendant's residence." *United States v. Boykin,* 986 F.2d 270, 274 (8th Cir.1993). It is not material, contrary to Kitchen's assertions, that he was incarcerated at the time the agents actually seized the guns. The jury might nevertheless have determined that he constructively possessed the guns *before* he was incarcerated, despite the fact that the guns were seized later. If he in fact resided at Williams's home, then he had the power to exercise control over the two firearms. *See also United States v. Wilson,* 922 F.2d 1336, 1339 (7th Cir.), *cert. denied,* 502 U.S. 850, 112 S.Ct. 155, 116 L.Ed.2d 120 (1991) (holding rational the conclusion that a gun found in the home of a felon's girlfriend had been possessed by the felon).

■ Neither is it material that other adults had access to the residence and may have had the same power to exercise control over the firearms that Kitchen had. Constructive possession may be either sole or joint. *See Garrett,* 903 F.2d at 1110 (possession "need not be exclusive but may be joint"). *See also United States v. Thompson,* 990 F.2d 301, 304 (7th Cir.1993) (fact that firearm may have been jointly possessed affected neither culpability nor minimized role in offense). The fact that Williams, too, had access to the firearms fails to negate the inference that Kitchen did as well. The law recognizes the possibility of joint possession. *Garrett,* 903 F.2d at 1110.

The evidence is therefore sufficient to support Kitchen's conviction for a felon's possession of a firearm under Section 922(g)(1). The jury might have determined that he lived at the residence and occupied the bedroom where the guns were located. Under these circumstances, we believe that Kitchen constructively possessed the guns in question.

■ The sufficiency of the evidence supporting Kitchen's conviction for the possession of cocaine under 21 U.S.C. § 841(a)(1) gives us more pause, however. In order to sustain a conviction under 21 U.S.C. § 841(a)(1), the government must show that: (1) the defendant knowingly or intentionally possessed cocaine, (2) he possessed cocaine with the intent to distribute it and (3) he knew that the material was a controlled substance. *United States v. Windom,* 19 F.3d 1190, 1199 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994). Here, again, the only element that Kitchen contests is possession, and the issue is a close one.

As the foregoing discussion demonstrates, the doctrine of "possession" contains concepts that can become almost metaphysical. Few would suggest that "possession" of an object should be confined to instances of physical holding. The second part of this case raises the opposite, yet related, question: is any physical holding—no matter the circumstances—sufficient to establish possession? It is the government's position that Kitchen actually possessed the cocaine because he picked up one of the kilograms for 2 or 3 seconds.[1]

Possession, again, may be either "actual" or "constructive." *See United States v. Perry,* 747 F.2d 1165, 1171 (7th Cir.1984). It is the government's position that actual possession is established if a defendant picks a controlled substance up for "one fleeting moment"—or 2 or 3 seconds, as seems to have occurred here. This position, the government asserts, is supported by cases such as *United States v. Toro,* 840 F.2d 1221, 1237 (5th Cir.1988), *United States v. Jones,* 676 F.2d 327, 332 (8th Cir.), *cert. denied,* 459 U.S. 832, 103 S.Ct. 71, 74 L.Ed.2d 71 (1982), and

---

**1.** Kitchen contends that he never actually touched the cocaine and points to an expert's inability to locate his fingerprints on the bags containing the substance. Tr. 341–42. Given the standard for our review of a jury's verdict, *see Garrett,* 903 F.2d at 1109, we are constrained to accept the government's version of events on this point. Assuming Kitchen did pick up the cocaine for two or three seconds, therefore, we will examine whether the requirements of possession have been satisfied.

*United States v. Posner,* 868 F.2d 720, 722 (5th Cir.1989).

These cases do discuss actual possession, each ultimately suggesting that the government need not risk a defendant's escape in order to produce evidence for a later charge of possession. *See also United States v. Maldonado,* 23 F.3d 4, 6–8 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 451, 130 L.Ed.2d 360 (1994); *United States v. O'Connor,* 737 F.2d 814, 818 (9th Cir.1984), *cert. denied,* 469 U.S. 1218, 105 S.Ct. 1198, 84 L.Ed.2d 343 (1985). The common theme in each case is the court's refusal to define possession in "a manner that affords [a defendant] an opportunity to escape with the contraband." *Toro,* 840 F.2d at 1238. *See also Posner,* 868 F.2d at 723. And in each case, the court rejects the argument that a defendant cannot have possessed the controlled substance in light of the presence of federal agents. *Toro,* 840 F.2d at 1237; *Jones,* 676 F.2d at 332. But these cases hardly establish that Kitchen's "fleeting moment" of contact with the narcotics demonstrates actual possession. The record here in no way suggests that Kitchen was preparing to leave with the drugs. And Kitchen does not argue that the presence and authority of federal agents alone should stand in the way of a possession conviction.

*Toro* and *Jones* and *Posner* do not otherwise support the government's position, which we understand to be some extraordinarily literal application of the definition of "possession." The government suggests that any time a defendant has an object in his hands, the law should recognize his "possession" of it. Yet none of the cases upon which the government relies embraces such an application of the doctrine. Instead, in each, the defendant engaged in some act that was clearly consistent with transporting the narcotics away from the scene of the transaction. In *Toro,* the defendant took the cocaine from the government agent and put it in a briefcase which he then locked. 840 F.2d at 1238. In *Jones,* the defendant loaded bales of marijuana into his van. 676 F.2d at 332. And in *Posner,* the defendant's coconspirator accepted keys to a van containing marijuana, got into the van and attempted to start it. 868

F.2d at 724. These cases all involve conduct over and above a defendant's momentary handling of a controlled substance.

This conduct—all acts indicating that transportation of narcotics is imminent—is important precisely because it is unequivocal. By taking delivery of the drug and loading it into a briefcase or a van, a defendant clearly demonstrates his assent to the drug transaction. Here, however, we have no indication of assent. The record is devoid of evidence that Kitchen intended to walk away with the narcotics or otherwise transport them. This factual distinction might not be dispositive if the record revealed *any* evidence that Kitchen had completed the sale or indicated some sort of unequivocal agreement to complete the drug transaction. Given that sort of clear evidence, perhaps a momentary holding, without more, would be sufficient to demonstrate actual possession. But that is not the case before us now.

The undisputed evidence in Kitchen's case tells a strikingly different story—different, ultimately, because here, the sale of the drugs remained incomplete at the time of arrest, and the record reveals no other indication that Kitchen would have proceeded with the drug sale. On the day of the proposed transaction, Kitchen and his coconspirator Dowdell met the government informant Griffin and the undercover agent Casali at a predetermined location. There, the four men got into Kitchen's car. The stated plan was for Kitchen to pay for one kilogram of cocaine and have the remaining kilogram "fronted" to him for payment at a later date. Tr. 205. Kitchen showed Casali the money and then handed it to his coconspirator, Dowdell. Casali admitted that at no point did either Kitchen or Dowdell offer Griffin or him the money or attempt to hand the money over. Tr. 262. Instead, Kitchen left the money with Dowdell and proceeded to another location with Casali to examine the drugs.

Both at the initial meeting and en route to the second location, Casali repeatedly urged Kitchen to "check out the merchandise" or otherwise inspect the narcotics. Tr. 213, 263–66, 272–73, 278–79, 313–15. Griffin, too, suggested that Kitchen should satisfy himself by inspecting the drugs. Tr. 247, 616. It is

clear that Kitchen proceeded to the second location with Casali to do just this.

It is also clear, however, that at the second location, no transaction occurred. Casali admitted that Kitchen never stated that he would complete the transaction or made a similar affirmative comment to that effect. Tr. 284. Instead, Kitchen made a statement expressing doubt about the quality of the cocaine. Tr. 218, 279, 1041–42. These factors indicate that the transaction simply had not been completed at the time of Kitchen's arrest. Kitchen had neither tendered any portion of the money nor otherwise agreed to complete the transaction. Absent evidence suggesting that the transaction was in any sense final or certain, we are quite uncomfortable with the notion that momentary contact with narcotics establishes actual possession.

Our discomfort stems from a number of sources. First, the cases upholding convictions for possession do so only in the context of some sort of unequivocal conduct on the part of the defendants. Often, as in *Toro, Jones* and *Posner*, that conduct will consist of actions consistent with transporting the drug away from the site of the deal. In other circumstances, however, the conduct may be more idiosyncratic. In *Santiago v. United States*, 889 F.2d 371, 374–75 (1st Cir.1989), for instance, the court fastened upon the fact that one of the defendants was leaving to purchase a pair of shoes to replace the government informant's shoes, which secreted illegal drugs. 889 F.2d at 377 ("The informant had unequivocally given up his shoes, and petitioner was about to go buy him new shoes. Delivery was complete."). *See also Maldonado*, 23 F.3d at 7 (securing drugs in defendant's room sufficient to establish possession despite the fact that the transaction had not yet been completed); *O'Connor*, 737 F.2d at 818 (performance of tests on each of thirty one-kilo bags of cocaine over a two-hour period established possession).

We do not attempt to use the present case to formulate a rule workable for all circumstances. Nor, by focusing on the incomplete nature of the narcotics deal here, do we wish to suggest that all drug transactions must be "complete" in order to later establish posses-sion at trial. Of necessity, the particulars of a given drug transaction will drive the determination that a certain aspect of the defendant's conduct is unequivocal enough to establish possession. But here, nothing in the record convinces us that Kitchen's momentary holding constitutes possession of the drugs. Money had not yet changed hands, and Kitchen had not otherwise assented to the deal. *See Toro*, 840 F.2d at 1230 (defendant agreed to pay for the cocaine that he later accepted). *See also United States v. Ivy*, 973 F.2d 1184, 1189 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1826, 123 L.Ed.2d 455 (1993) (evidence sufficient to support a conviction for possession where defendant handed over cash and accepted drug, ultimately beginning to inspect it); *United States v. Perry*, 747 F.2d 1165, 1166–67 (7th Cir.1984) (exchange of some of agreed upon sum and opening of defendant's car trunk sufficient to establish possession). Instead, Kitchen's momentary holding was in the context of inspection, not delivery.

By demanding some sort of unequivocal conduct or assent to the transaction we do not invade the jury's province. We remain aware that the jury is entrusted with finding the facts, and we remain bound by the principle that we must view the evidence in the light most favorable to the government. *Garrett*, 903 F.2d at 1109. But resort to this principle cannot be used as a substitute for essential proof. The government is still in the position of establishing possession as an element of the crime. *Windom*, 19 F.3d at 1199. And here, the essential proof of possession that we require is *some factor* indicating that Kitchen had the authority or the ability to exercise control over the contraband.

 This demand is hardly foreign to the doctrine of possession. Constructive possession, as developed in this circuit, expressly demands this sort of showing. *United States v. Manzella*, 791 F.2d 1263, 1266 (7th Cir. 1986). The government suggests that this factor is not relevant in light of Kitchen's momentary holding of the narcotics. Yet the cases discussing actual possession do not support this argument; in each, as demonstrated, some sort of unequivocal conduct

indicating acceptance of the drug or assent to the transaction was present. We suspect, in any event, that the notion of control is not absent from the concept of actual possession.[2] *See Toro*, 840 F.2d at 1237 (noting defendant's "brief dominion" over the cocaine). In most cases of actual possession, because the defendant physically holds or carries the narcotics, his control over them is presumed. But to state that control is presumed is not to suggest that actual possession can be established when it is completely absent.

■ The facts suggest that it was absent in this case. The constructive possession cases teach that a defendant must have ultimate control over the drugs. This requirement translates into the right, or the recognized authority within the "criminal milieu," to possess the drugs in question. *Manzella*, 791 F.2d at 1266. This authority is not necessarily established when a defendant acts as a broker in a drug transaction. *Id.* As we noted in *Manzella*, "a stock broker often will have custody of his customer's stocks, [but] rarely will he possess the stocks before buying them for the customer." *Id.* Neither is this authority established merely because a defendant has the power or the opportunity to make off with another's property, because "the power to make off with someone else's property is not equivalent to a right to the property." *United States v. Ortega*, 44 F.3d 505, 507 (7th Cir.1995).

These factors are dispositive in the present case. Although Kitchen held the cocaine in his hand, he did not yet have a recognized authority to exert control over it. This is so not because the presence of federal agents would have ultimately prevented his success, *Toro*, 840 F.2d at 1237, but because he had not yet assented in any form to the transaction. Had he paid part of the purchase price, *see Perry*, 747 F.2d at 1167, verbally assented to the deal, *see Barnett v. United States*, 171 F.2d 721, 722 (9th Cir.1949), or otherwise unambiguously indicated his agreement to complete the deal, *see Santiago*, 889 F.2d at 374, the case would be different. But the government has failed to point to factors that would enable a jury to find that Kitchen accepted the cocaine. It is critical here that, prior to giving some sort of assent to the sale, Kitchen's conduct was consistent only with that of a prospective buyer inspecting goods. He did not yet have the ability to control the contraband, despite the fact that he momentarily held it in his hand.

■ The government does, however, point to evidence of Kitchen's *intent* to transact a drug deal. And it suggests that the jury concluded that Kitchen *intended* to purchase the cocaine. It further suggests that various indicia of Kitchen's intent should be sufficient to establish possession of the narcotics. In support of this conclusion, the government highlights the repeated phone conversations between Kitchen and Griffin discussing potential transactions; Kitchen's various admissions about unrelated drug dealings; and Kitchen's arrival at the scene with the required cash in hand.[3] Yet these

---

2. Implicit in a common-sense understanding of possession—both actual and constructive—is the notion that a defendant has some right or ability to control the disposition of an object. An approved jury instruction on actual possession, for instance, states that a "person who knowingly has direct physical control over a thing, at a given time, is then in actual possession of it." *See United States v. Perlaza*, 818 F.2d 1354, 1361 n. 3 (7th Cir.), *cert. denied*, 484 U.S. 861, 108 S.Ct. 176, 98 L.Ed.2d 130 (1987) (quoting the "Devitt Instruction," E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions*, § 16.07, at 512–13 (1977)).

3. The government also points to a statement Kitchen made just prior to his arrest. As he was picking up the cocaine, Kitchen stated: "I was worried about slabs." Tr. 284. A slab, apparently, is one of the most desirable forms of cocaine. Tr. 1041, 1045–46. Kitchen claims that this statement indicated his desire to purchase slabs and was thus an expression of worry about the quality of the cocaine that the agents had offered to him. Tr. 1041–42. Casali, the government agent conducting the operation, appears to have understood it as such. Tr. 218, 279. Yet the government suggested at oral argument that the statement is evidence of Kitchen's intent to go forward with the transaction. Its theory, apparently, involves a focus upon verb tense. It claims that Kitchen's statement that he *was* worried should be read as a statement that he had been worried, but that he was not worried any longer.

Although we find this focus on verb tense dubious, we note that resolution of the matter has no bearing on the outcome of the case. Even if the government is correct (a matter which we

factors establish only that Kitchen intended to purchase cocaine, and Kitchen's *intent* to purchase, without more, is insufficient to establish possession because it overlooks the required element of dominion or control. *See Toro*, 840 F.2d at 1237; *Manzella*, 791 F.2d at 1266.

By reading the element of control out of the equation, we risk confusing possession with attempted possession. It is well-established that intent is a key element of the doctrine of attempted possession. *United States v. Weaver*, 8 F.3d 1240, 1243 (7th Cir.1993) ("Because attempt to possess a controlled substance is an inchoate crime, it does not require completion of the act of possession."). Given intent, the jury's focus is directed to whether the defendant engaged in conduct that constituted a "substantial step" toward the commission of the crime. *See generally United States v. Valencia*, 907 F.2d 671, 683–84 (7th Cir.1990). An examination of garden variety attempt cases reveals that Kitchen's conduct is more consistent with that sort of criminal behavior. *See, e.g., United States v. Rosalez–Cortez*, 19 F.3d 1210, 1217 (7th Cir.1994) (evidence sufficient to support attempt to possess, despite fact that cocaine had not yet been delivered, where defendant sought out government informant and paid for drug); *United States v. Sutton*, 961 F.2d 476, 478 (4th Cir.), *cert. denied*, ––– U.S. –––, 113 S.Ct. 171, 121 L.Ed.2d 118 (1992) (evidence sufficient to support attempt where only step remaining was actual exchange of the money and the drug). While these attempt cases hardly establish the absence of possession in Kitchen's case, they do suggest that his case fits more neatly into an attempt paradigm.[4]

The intent to engage in a drug transaction, without more, cannot support a conviction for possession. The missing link in this case is the ability to control the contraband. Had the evidence indicated some sort of unequivocal assent to the trans-

action, then a momentary holding might have been sufficient to establish the required element of control. But the momentary holding upon which the government relies here simply is not adequate to overcome our concerns. There simply is no evidence—such as payment of the purchase price or verbal agreement—that the drug transaction was in any sense certain or complete. We believe that although Kitchen held the drugs for a moment, he neither controlled them nor had recognized authority over them. His conduct was consistent with inspection—but nothing more. Lack of control is dispositive under both the doctrines of actual and constructive possession. *See Toro*, 840 F.2d at 1237; *Manzella*, 791 F.2d at 1266. We therefore find the evidence insufficient to support Kitchen's conviction for possession of cocaine.

### III.

Because the evidence established that Kitchen resided in the home in which the police located the firearms, it was sufficient to support Kitchen's conviction for the possession of a firearm. We therefore AFFIRM in part. We are not, however, persuaded that the momentary holding that occurred here established Kitchen's possession—either actual or constructive—of the cocaine. Kitchen's conviction for possession of cocaine is therefore REVERSED.

---

doubt), the statement at most demonstrates Kitchen's intention to purchase cocaine, which, for the reasons stated, is insufficient to establish possession.

4. The government argues that the jury's rejection of an attempt conviction, despite instructions on that point, effectively establishes possession. This argument ignores our obligation as a reviewing court, which is to articulate the boundaries of the legal doctrines involved in the case.