# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00253-CR

**Charles Hill, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
### NO. D-1-DC-07-205322, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

A jury convicted Charles Hill of the offense of possessing a controlled substance (cocaine) in an amount of less than one gram. *See* Tex. Health & Safety Code Ann. § 481.002(38) (West Supp. 2008), § 481.115 (West 2003). Punishment was assessed at imprisonment for nine years and one day, plus a $10,000 fine. In two points of error, Hill challenges the legal and factual sufficiency of the evidence. We will affirm the judgment.

### BACKGROUND

The jury heard evidence that, on the night of September 7, 2007, Hill agreed to purchase crack cocaine from an undercover officer in the Austin Police Department, who was posing as a drug dealer. The undercover operation took place in the area of 13th Street and Chicon in Austin. The undercover officer explained that he was approached by Hill, who asked the officer

"for $5 worth of crack."  The officer told Hill that he had to purchase at least ten dollars worth of crack cocaine.  According to the officer, Hill agreed.  The officer recounted what happened next:

> At that point I went to a vehicle, which is a minivan, and I opened the door and I acted as if I was getting something out of the van. . . .  I reached in my pocket and pulled out one rock [of crack cocaine], put the rest of it back in my pocket and I turned to Mr. Hill and told him okay, where is my money.  He showed me a wad of cash and I gave him the crack cocaine and I gave the predetermined bust signal, which is 'good deal.'

When asked how he gave Hill the cocaine, the officer testified, "I put the rock in his hand."

After the undercover officer gave the bust signal, a team of "takedown" officers "jumped out of the van" and grabbed Hill.  The officers and Hill fell to the ground, along with the cocaine.  The undercover officer testified that he did not remember if Hill threw the drugs on the ground or if they just fell to the ground.  According to the officer, it was typical for the drugs in undercover busts to end up on the ground "on every single arrest."  The undercover officer retrieved the cocaine, and Hill was taken into custody.  The officer could not recall whether the rock was "right at [Hill's] feet or [Hill's] hand" when Hill was on the ground, nor the distance between Hill and the cocaine.

A videotaped recording of the transaction and bust was admitted into evidence and played for the jury.[1]  However, because of the poor video quality of the recording, it is difficult to discern images beyond, as the State observes, "silhouettes and some movement."[2]  The officer

---

[1]  Another officer in a police SUV across the street from the minivan had recorded the transaction with a handheld camera.

[2]  According to the undercover officer, "It's hard to see on the video because it's taken at night by a camera that doesn't have night vision."  Another officer testified that the vehicle from which the recording was made had tinted windows.

admitted that the video "doesn't show the hand-to-hand very clearly, but you can hear the audio and you can see Mr. Hill as he begins to walk away." On the recording, one person can be heard asking another, "You ain't no law, are you?" The other person responds, "No, I'm a Hill, baby." Then, the recording appears to show the exchange and "takedown" occurring. The undercover officer narrated the recording as it was being played for the jury:

> The last part I handed him the crack cocaine in exchange for the money and just before that I asked him, 'So, where is my money?' I don't know if you could hear it very well, but I said where is my money, and at that point I saw he had a wad of cash in his hand. I handed him the crack cocaine, he gave me the money pretty much the same time, and I said good deal. I said it twice.

The officer could not tell from the recording how much time had elapsed between him giving the bust signal and the takedown officers seizing Hill, but he testified that "[i]t looks like it could have been a couple of seconds."

The jury also heard testimony from Officer Anthony Nelson of the Austin Police Department. Officer Nelson was monitoring the operation in a police SUV across the street. He testified that he observed a "hand-to-hand transaction" between Hill and the undercover officer. When asked what he meant by "hand-to-hand transaction," Nelson explained, "It's most common for people who traffic narcotics to quickly go from my hand to yours, my hand to yours. If you have money, I want your money, you want my drugs. It's my hand to yours. That's commonly known as hand to hand." When asked if he saw something from the undercover officer's hands go to the suspect's hands, Nelson testified, "Yeah, what I saw was what looked like an exchange. It didn't

3

appear [as] if they were shaking hands or hey, I haven't seen you since Thanksgiving kind of thing. It looked like a transaction, a hand to hand."

On the night of Hill's arrest, Detective Jason Bryant of the Austin Police Department was in charge of the narcotics portion of the undercover operation. Detective Bryant testified about how these operations are typically conducted. He explained that, whenever undercover officers make a sale, "they give a predetermined bust signal and probably within two to three seconds of the transfer going down the subject is grabbed." Bryant added that the undercover officers are instructed not to give the signal "until the deal is made." A "deal is made," according to Bryant, when the subject is "in possession of the controlled substance."

Ralph Salazar, a forensic scientist with the Austin Police Department, analyzed the substance that Hill was alleged to have possessed. Salazar testified that he determined that the substance was crack cocaine and that it weighed 0.30 grams.

Hill's sister, Joyce, testified for the defense. Joyce testified that, on the night her brother was arrested, she was standing on the corner of 13th Street and Chicon, waiting for a friend to arrive. She claimed that, as she was waiting, Hill pulled up in his car, parked on the street, got out of the car, and asked her if she needed a ride. According to Joyce, before she could accept, a person whom Joyce believed to be a police officer approached them, told Joyce that she "wasn't going to get a ride tonight," and led Hill away to a minivan across the street. Joyce explained, "There was a van. The police was in the van, yes, sir. The police had came across the street and drugged my brother damned near across the street then slammed him on the ground." Joyce added, "[T]hey slugged him, they body slammed him down on the ground real hard." Meanwhile, Joyce

4

testified, another police officer was "holding [her] down" and preventing her from approaching her brother. Then, according to Joyce, the officers placed Hill in a patrol car and told Joyce to "get away from there right now" or they would take her to jail "for interfering in the police work." When asked if she saw Hill and the officer "do anything else," Joyce testified,

> No, sir. He didn't hand him no type of drugs. He did not hand them no type of money or no exchange and no action or no contact of weapon. I was really looking at that part. I was wondering why they would be dragging him, just made him go across the street. He was trying to talk to me but the man just came from the other side of the street and practically pulled him over there and make him buy drugs.

On cross-examination, the State elicited the following testimony from Joyce:

> Q: Have you ever been convicted of a felony or crime of moral turpitude in the last ten years?
>
> A: Yes, sir. Right now I have been entrapped myself for selling drugs to an undercover law. I am fixing to do time right now for that.
>
> Q: For delivering a controlled substance?
>
> A: Yes, sir, it wasn't a real drug but it was related to a drug they said.
>
> Q: That's what you said you are going to the state jail for?
>
> A: Exactly. I got six months time for that.
>
> . . . .
>
> Q: Weren't you—if your brother were to say he was actually there to buy crack cocaine, would you be surprised by that?
>
> A: I wouldn't be surprised.

5

Joyce also admitted that she had been smoking crack cocaine on the night her brother was arrested, but insisted that the effects of the drug lasted "maybe about two or three minutes" and that she was "real sober" by the time her brother was arrested.

Hill also testified in his defense. Hill explained that, when he got out of his car to talk to his sister, the undercover officer walked over to them and "solicited" Hill. Hill testified that the officer asked him, "What are you looking for?" Then, according to Hill,

> [The undercover officer] said walk with me, so we walked across the street. As we crossed the curb, he switched his cap around. By the time we get to the van, I had $9 in my hand. He snatched the $9 out of my hand, got the keys out of the pocket and opened the trunk door. By then he reached over to hand me some. By then about five cops toppled me to the ground. I never had possession of nothing.

However, Hill admitted that he had been trying to buy crack cocaine on the night he was arrested. He claimed that he was buying it for a friend, Angie Washington, whom Hill claimed was in his car when he was arrested. Hill testified, "I ain't going to deny it, I had $9 that day and I did try to buy some but I never even possessed the drugs." Hill also claimed that the police were "flat out lying," that the images and voices on the video recording were not him. Hill further admitted that he had been smoking crack during the morning of his arrest, but could not recall how much. Additionally, Hill admitted to being convicted for prior felony offenses, including theft in 2006, unauthorized use of a motor vehicle in 2005, burglary of a habitation in 2003, and possession of a controlled substance in 2000.

6

The jury found Hill guilty.  After finding the enhancement paragraphs alleged in the indictment to be true, the jury sentenced Hill to imprisonment for nine years and one day and imposed a fine of $10,000.  This appeal followed.

## STANDARD OF REVIEW

In a legal sufficiency review, we consider whether, after viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found the elements of the offense beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  "This standard accounts for the factfinder's duty 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"  *Clayton*, 235 S.W.3d at 778 (quoting *Jackson*, 443 U.S. at 319).  It is not necessary that every fact point directly and independently to the defendant's guilt, but it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.  *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

In a factual sufficiency review, we consider whether, after viewing the evidence in a neutral light, a rational trier of fact was justified in finding guilt beyond a reasonable doubt.  *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006).  We "must be cognizant of the fact that a jury has already passed on the facts and must give due deference to the determinations of the jury."  *Lancon v. State*, 253 S.W.3d 699, 704-05 (Tex. Crim. App. 2008).  "A verdict should be set aside only if the evidence supporting the verdict is so weak as to render the verdict clearly wrong or manifestly unjust."  *Id*. at 705; *Korell v. State*, 253 S.W.3d 405, 412 (Tex. App.—Austin 2008, pet. ref'd).  Therefore, we will not reverse a case on a factual sufficiency challenge unless we can

say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the verdict. *Watson*, 204 S.W.3d at 417.

## ANALYSIS

To establish the offense of possession of a controlled substance, the State must prove that: (1) the accused exercised actual care, custody, control, or management over the contraband; and (2) the accused knew the matter possessed was contraband. *See* Tex. Health & Safety Code Ann. §§ 481.002(38), 481.115(a); *Evans v. State*, 202 S.W.3d 158, 161 (Tex. Crim. App. 2006). Hill contests only the first element, arguing that the evidence is legally and factually insufficient to prove that he had "secured the rock to his actual care, custody, control, or management before he was arrested by the takedown team." In other words, according to Hill, the officers seized him before he was able to take possession of the drugs.

The duration or length of time contraband is under a person's control does not alone determine whether that person possessed the contraband. *See Brewer v. State*, 500 S.W.2d 504, 506 (Tex. Crim. App. 1973). Hill acknowledges this rule, but asserts that the "touching of an item for less than one second should not equate to possession." According to Hill, the rock "had been placed in appellant's hand by the officer as it simultaneously fell to the ground during the takedown." In Hill's view, because there was no evidence presented that he was "about to leave with the contraband" prior to being arrested, the State failed to prove that he exercised actual care, custody, control, or management of the drugs.

8

Hill does not cite to any Texas authority to support this argument. Instead, Hill relies solely on *United States v. Kitchen*, 57 F.3d 516 (7th Cir. 1995).[3] In *Kitchen*, the defendant sought to purchase cocaine from a police informant. *Id*. at 519. The informant—who was accompanied by an undercover police officer posing as a drug trafficker—met Kitchen and Kitchen's friend at a pre-arranged location. During the meeting, Kitchen produced envelopes containing $14,000 in cash. *Id*. However, instead of transferring the cash to the officer, Kitchen left the cash with his friend, while he and the undercover officer traveled to a separate location "to check the merchandise." *Id*. At this location, another undercover officer was waiting with two kilograms of cocaine in the trunk of his car. *Id*. When the three men met at this location, the undercover officer opened his trunk, inside of which was a white garbage bag. *Id*. One of the officers opened the bag, revealing two packages of cocaine. *Id*. At trial, Kitchen claimed that he never touched the cocaine, while the undercover officers testified that Kitchen had picked up one of the kilograms of cocaine for "two or three seconds." *Id*. Whether or not Kitchen touched the cocaine, it was undisputed that Kitchen expressed concerns about the cocaine's "purity." *Id*. At that point, the officers placed Kitchen under arrest. *Id*. Kitchen was subsequently convicted of the offense of possession of cocaine with intent to distribute. *Id*. at 518.

---

[3] We are not, strictly speaking, bound by the decisions of the federal appeals courts. *See Reynolds v. State*, 4 S.W.3d 13, 21 n.17 (Tex. Crim. App. 1999); *Stewart v. State*, 686 S.W.2d 118, 121 (Tex. Crim. App. 1984); *Pruett v. State*, 463 S.W.2d 191, 194 (Tex. Crim. App. 1971). However, because the Texas Controlled Substances Act is patterned after the federal narcotics statute, *see* Act of May 28, 1973, 63rd Leg., R.S., ch. 429, § 1.02, 1973 Tex. Gen. Laws 1132, 1133 (current version at Tex. Health & Safety Code Ann. § 481.002(18) (West Supp. 2008)), we may look to federal caselaw for guidance. *See Reynolds v. State*, 981 S.W.2d 926, 928 (Tex. App.—Houston [1st Dist.] 1998, no pet.); *Jimenez v. State*, 739 S.W.2d 499, 503 (Tex. App.—Corpus Christi 1987, pet. ref'd).

On appeal, Kitchen argued that the evidence was insufficient to prove that he had possessed the cocaine. *Id*. at 520. The appeals court—although concluding that "the issue is a close one"—agreed. *Id*. at 521. Viewing the evidence in the light most favorable to the verdict—i.e., that Kitchen picked up the cocaine for "two to three seconds"—the court examined whether such a momentary handling of the contraband constituted possession in that case. *See id*. at 521 n.1. The court held that it did not. *Id*. at 525. According to the appeals court, the record was "devoid of evidence that Kitchen intended to walk away with the narcotics or otherwise transport them." *Id*. at 522. The court added that this fact "might not be dispositive if the record revealed any evidence that Kitchen had completed the sale or indicated some sort of unequivocal agreement to complete the drug transaction." *Id*. If such evidence existed, the appeals court explained, "perhaps a momentary holding, without more, would be sufficient to demonstrate actual possession. But that is not the case before us now." *Id*. The appeals court concluded,

> There simply is no evidence—such as payment of the purchase price or verbal agreement—that the drug transaction was in any sense certain or complete. We believe that although Kitchen held the drugs for a moment, he neither controlled them nor had recognized authority over them. His conduct was consistent with inspection—but nothing more. Lack of control is dispositive under both the doctrines of actual and constructive possession. We therefore find the evidence insufficient to support Kitchen's conviction for possession of cocaine.

*Id*. at 525. However, the court emphasized that its holding was limited to the unique facts of the case:

> We do not attempt to use the present case to formulate a rule workable for all circumstances. Nor, by focusing on the incomplete nature of the narcotics deal here, do we wish to suggest that all drug transactions must be 'complete' in order to later

establish possession at trial. Of necessity, the particulars of a given drug transaction will drive the determination that a certain aspect of the defendant's conduct is unequivocal enough to establish possession. But here, nothing in the record convinces us that Kitchen's momentary holding constitutes possession of the drugs. Money had not yet changed hands, and Kitchen had not otherwise assented to the deal.

*Id*. at 523.

We are unpersuaded that the rationale of *Kitchen* extends to this case. In *Kitchen*, "no transaction occurred." *Id*. Kitchen did not tender the purchase money to the officers or otherwise agree to buy the drugs. Instead, the evidence showed that, at most, Kitchen merely inspected the drugs and expressed concerns about their "purity." In this case, however, the jury heard evidence that, in a "hand-to-hand transaction," Hill and the undercover officer exchanged drugs and cash "at pretty much the same time." The officer testified that, as he gave Hill a rock of crack cocaine, Hill handed the undercover officer the purchase money. Another officer confirmed that he observed this "hand-to-hand transaction" occur. Thus, unlike in *Kitchen*, there was evidence in this case that Hill and the undercover officer "completed the sale."

Furthermore, we find the court's reasoning in *Kitchen* at odds with the line of Texas cases holding that a jury can find the element of possession regardless of how briefly a defendant handles the contraband. *See, e.g.*, *Brewer*, 500 S.W.2d at 506 (finding evidence sufficient to prove possession of marihuana even though defendant took joint from witness, held onto it "for about a minute," did not smoke it, and gave it back to witness); *Reed v. State*, 472 S.W.2d 757, 758 (Tex. Crim. App. 1971) (finding evidence sufficient to prove possession of controlled substance even though defendant was arrested immediately upon purchase of illegal prescription at drug store);

11

*Sutton v. State*, 343 S.W.2d 452, 454 (Tex. Crim. App. 1961) (finding evidence sufficient to prove possession of heroin even though defendant handled drugs for approximately 25 seconds); *Hawkins v. State*, 214 S.W.3d 668, 670 (Tex. App.—Waco 2007, no pet.) (in theft case, finding evidence sufficient to show that defendant exercised control over stolen property even though defendant dropped property immediately after he was caught lifting it); *Reynolds v. State*, 981 S.W.2d 926 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (in possession-of-cocaine case, finding evidence sufficient to show that defendant exercised control over bag of cocaine even though defendant dropped bag on hotel bed immediately after taking it from undercover officer and looking inside bag). Hill cites to no Texas case that follows *Kitchen* and we are not aware of one.

Additionally, other federal courts, including the Fifth Circuit, have rejected arguments similar to the one Hill advances. For example, in *United States v. Toro*, a federal agent delivered cocaine to the defendant in a parking lot. 840 F.2d 1221, 1230 (5th Cir. 1988). The defendant put the cocaine into his briefcase and was immediately arrested. *Id*. He was subsequently convicted of the offense of possession of cocaine with intent to distribute. *Id*. The defendant argued that the evidence was insufficient to prove possession because (1) the federal agent maintained dominion over the cocaine up until the time of delivery; and (2) the presence of numerous agents at the arrest site precluded the possibility that the defendant would ever leave the parking lot or do anything with the cocaine prior to being arrested. *Id*. at 1237. The Fifth Circuit rejected these arguments:

> Although the resulting arrest immediately thereafter terminated [the defendant's] brief dominion over the cocaine, that does not mean that dominion sufficient to justify conviction in a reasonable juror's mind never existed. To hold otherwise would require us to define 'possession' in a manner that affords [the defendant] an opportunity to escape with the contraband. That we decline to do. Such a definition

12

> would defy common sense, place an impossible burden on police, and contribute to the very evil that the violated statute intended to eliminate.

*Id*. at 1237-38; *see also Santiago v. United States*, 889 F.2d 371, 376 (1st Cir. 1989) (finding that, once informant "handed over" contraband to defendant, "delivery had taken place" and defendant had possession of contraband); *United States v. Martorano*, 709 F.2d 863, 871(3rd Cir. 1983) (holding that law enforcement officers should not be required to allow suspect time to escape prior to arresting suspect for possession); *United States v. Jones*, 676 F.2d 327, 332 (8th Cir. 1982) ("The fact that the agents intended to arrest [the defendant] and recover control of the marijuana does not negate the fact that, for however short a period of time, [the defendant] was in actual control of the marijuana.").

We agree with the reasoning of these other federal courts of appeals. The amount of time that a defendant handles a controlled substance does not alone control whether or not the defendant exercised actual care, custody, control, or management of the substance. In this case, the evidence supporting the jury's finding that Hill exercised actual care, custody, control, or management of the contraband includes the following:

- The undercover officer testified that Hill, after asking the officer "for $5 worth of crack," agreed to purchase at least "ten dollars worth" of crack cocaine.

- The officer testified that he handed Hill the crack cocaine at "pretty much the same time" as Hill gave the officer the money. The officer further testified that the rock was in Hill's hand.

- Officer Nelson testified that he witnessed the transaction, and he observed "what looked like an exchange" or a "hand-to-hand transaction."

- Detective Bryant testified that, whenever undercover officers make a sale, "they give a predetermined bust signal and probably within two to three seconds of the transfer going down

the subject is grabbed." Bryant added that the undercover officers are instructed not to give the signal "until the deal is made." A "deal is made," according to Bryant, when the subject is "in possession of the controlled substance."

- On the videotape recording of the transaction, the voices of two individuals can be heard discussing a drug deal. One of these voices, the person wanting to purchase the drugs, identifies himself by saying, "I'm a Hill." Shortly thereafter, the other voice says, "Good deal." The recording then shows the person who agreed to purchase the drugs being arrested.

Viewing the above evidence in the light most favorable to the verdict, we conclude that the evidence is legally sufficient to support the jury's finding that Hill exercised actual care, custody, control, or management over the contraband. The undercover officer testified that he gave Hill the drugs as Hill gave him the money. Furthermore, Officer Nelson testified that he observed what appeared to be an exchange or a "hand-to-hand transaction" between Hill and the officer. The jury could reasonably infer from the testimony of the undercover officer and Nelson that Hill had completed a purchase of the cocaine and that the drugs were in Hill's hand prior to the arrest. Furthermore, voices on the video recording, including one person who identifies himself as "a Hill," can be heard transacting a drug deal. At the conclusion of the transaction, a voice can be heard saying, "Good deal." This phrase, according to the testimony of the police officers, is a "predetermined bust signal" that is given only when "a deal is made" and the suspect is "in possession of the controlled substance." The jury could reasonably infer from the voices on the recording and the corresponding testimony that the person heard on the recording purchasing the drugs was Hill and, because the bust signal had been given, that the drug deal had been completed.

When considering the above evidence in a neutral light, we also conclude that the evidence is factually sufficient to support Hill's conviction. Although the exchange cannot be clearly

seen on the recording, two people can be seen and heard conducting some sort of drug deal. Thus, contrary to Hill's assertion, the recording is not "demonstrative evidence reflecting appellant did not commit the indicted offense." Rather, at worst, the recording fails to establish that Hill and not someone else committed the offense, at least in the absence of other evidence identifying Hill as the person on the tape. When the recording is considered with other evidence in the case, particularly the testimony of the undercover officer, a jury could reasonably infer from that evidence that Hill committed the offense. Hill also observes that the cocaine was not found on his person when he was arrested. However, the undercover officer testified that the drugs end up on the ground "on every single arrest." It was not irrational for the jury to find that, because of the physical nature of the "takedown," Hill had possession of the cocaine prior to the arrest, but he dropped the cocaine on the ground during the arrest. As for the testimony of Hill and his sister denying that an exchange occurred, the jury was the sole judge of the credibility of the witnesses. Evidence was presented that Hill had prior felony convictions and that Joyce had been using crack cocaine on the night she claimed to have witnessed her brother being arrested. We find nothing irrational about the jury's decision to disbelieve the testimony of Hill and his sister and believe the testimony of the police officers. We cannot say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's finding that Hill possessed the cocaine.

We overrule Hill's points of error.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed:   February 6, 2009

Do Not Publish

16