In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-3932 & 99-3951

United States of America,

Plaintiff-Appellee,

v.

Nathan L. Hill and Cordell James,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 95 CR 730--Charles P. Kocoras, Judge.

Argued May 10, 2001--Decided June 5, 2001


   Before Posner, Easterbrook, and Diane P.
Wood, Circuit Judges.

   Easterbrook, Circuit Judge. Cordell James
and Nathan Hill have been sentenced to
life imprisonment. James, who was
convicted of a single count of conspiring
to distribute drugs, see 21 U.S.C.
sec.846, drew his sentence because of a
combination of his criminal record, the
scale of the operation (more than a ton
of cocaine), and his participation in the
murder of Robert Franklin. Hill received
a life sentence (and a fine exceeding $8
million) for operating a continuing
criminal enterprise, among other crimes.
See 21 U.S.C. sec.848.

   1.  Both defendants contend that their
sentences violate the due process clause
because the jury did not conclude that
the evidence establishes beyond a
reasonable doubt the events that led to
the life terms. See Apprendi v. New
Jersey, 530 U.S. 466, 120 S. Ct. 2348
(2000). But Apprendi does not help Hill,
because the maximum sentence for every
person convicted of violating sec.848 is
life. He insists that Apprendi governs
proof of events that determine the
minimum lawful sentence, but we rejected
that contention in United States v.
Smith, 223 F.3d 554, 562-66 (7th Cir.
2000). Although United States v. Flowal,
234 F.3d 932, 936-38 (6th Cir. 2000), is
at odds with Smith (of which the sixth

circuit apparently was unaware), we have previously declined to reconsider the holding of Smith and do not find in Flowal any reason to do so. See United States v. Hoover, 246 F.3d 1054, 1058 (7th Cir. 2001); United States v. Williams, 238 F.3d 871, 876-77 (7th Cir. 2001). Flowal does not discuss McMillan v. Pennsylvania, 477 U.S. 79 (1986), which held that judges may find, by a preponderance, facts that trigger mandatory minimum penalties. Apprendi did not overrule McMillan, see 530 U.S. at 487 n.13, yet, unless McMillan is to be discarded, Flowal and its successors, see United States v. Ramirez, 242 F.3d 348 (6th Cir. 2001); United States v. Strayhorn, 2001 U.S. App. Lexis 10513 (6th

Cir. May 22, 2001), cannot be correct. The sixth circuit is a minority of one, while Smith has the support of at least four other circuits--if any support on top of McMillan were required. See United States v. Harris, 243 F.3d 806 (4th Cir. 2001); United States v. Robinson, 241 F.3d 115, 122 (1st Cir. 2001); United States v. Keith, 230 F.3d 784, 787 (5th Cir. 2000); United States v. Aguayo-Delgado, 220 F.3d 926, 934 (8th Cir. 2000).

   James has a stronger claim in principle, because any sentence over 30 years depends on finding that a defendant with a prior drug felony conviction (which James has) conspired to distribute at least 5 grams of crack or 500 grams of cocaine hydrochloride. See 21 U.S.C. sec.841(b)(1)(B). But James did not ask at trial that the drug-quantity issue be submitted to the jury, and he cannot establish plain error given the volume of cocaine he and his confederates distributed. By convicting him, the jury evinced its finding that James agreed to distribute more than the statutory threshold. James's contention that he wasn't lawfully convicted of the extensive conspiracy charged in the indictment because, after Apprendi, each quantity level is a separate offense, was rejected in United States v. Brough, 243 F.3d 1078, 1079-80 (7th Cir. 2001). There is just one drug-distribution offense, defined by sec.841, and one drug-conspiracy offense, defined by sec.846. Quantity affects sentencing but does not create separate crimes. (Otherwise

someone like James could be convicted of three conspiracies for the same agreement and course of conduct, with each conviction representing the next plateau of drugs sold--or maybe of six conspiracies, if the organization distributed both cocaine and heroin, or nine conspiracies if it added marijuana to the inventory.)

2. The district judge declined to give Instruction 1.09 from the Federal Criminal Jury Instructions of the Seventh Circuit (1999). This instruction reads:

You may find the testimony of one witness or a few witnesses more persuasive than the testimony of a larger number. You need not accept the testimony of the larger number of witnesses.

Hill called only two witnesses, including himself, and James called none, so there was an imbalance in the number of witnesses presented. (The trial lasted seven weeks, and the prosecution had plenty of witnesses.) Defendants seek a new trial at which this instruction will be given.

The premise of defendants' argument is that every instruction in Seventh Circuit Federal Jury Instructions: Criminal must be given on request. That misunderstands the function of a pattern book. It offers model instructions for occasions when they are appropriate but does not identify those occasions; the need for an instruction must be determined independently. An instruction such as 1.09 might be called for if one side's lawyer argued that his client should prevail because he produced more witnesses. Then the judge should tell the jury, perhaps along the lines of Instruction 1.09, that this is not true, that quality of evidence counts more than quantity. No one in this case made a quantity-over-quality pitch, however, so there was no need for an antidote.

Even when a lawyer tries to mislead jurors about the significance of how many witnesses have testified, Instruction 1.09 leaves something to be desired: reasons. It tells jurors that they "may" do one thing and "need not" do the opposite, but that just states the obvious. Of course jurors "may" find the testimony of a single witness more

persuasive. Any juror who did not think that to begin with is unfit to serve. When should jurors find the testimony of one witness more persuasive? That's what matters, and Instruction 1.09 does nothing to furnish the answer. The underlying principle is that quality alone should govern the verdict; ten weasels are no more persuasive than one. That's a thought that district judges could convey directly--though again the point is obvious, so usually it is best left to the jurors' good sense. Why insult jurors' intelligence?

Jury instructions tend to be long and full of tedious boilerplate. When the judge emulates Polonius and recites gravely what jurors already know, their attention may wander and they could miss something that really matters. It is best to keep the instructions concise, which is achieved by omitting nostrums and leaving inferences to arguments of counsel. United States v. Sblendorio, 830 F.2d 1382, 1392-94 (7th Cir. 1987). Unless it is necessary to give an instruction, it is necessary not to give it, so that the important instructions stand out and are remembered. Instructions that include reasons are those most likely to make the cut for utility. See United States v. Cook, 102 F.3d 249, 251-52 (7th Cir. 1996); United States v. Austin, 215 F.3d 750, 752 (7th Cir. 2000). For example, the Federal Judicial Center's Pattern Criminal Jury Instructions (1987) include the advice not to "make any decisions simply because there were more witnesses on one side than on the other" as part of a more comprehensive instruction (No. 23) labeled "General Considerations in Evaluating Witnesses' Testimony". This instruction reminds jurors of several features that make testimony stronger and treats the quantity advice as a corollary to the principle that quality matters. Instruction 1.09 is less useful. Because nothing hindered the parties from covering this point in closing arguments if they deemed it important, the omission was sensible.

3. With the aid of standby counsel, both defendants represented themselves at trial. James (but not Hill) contends on appeal that he was deprived of the assistance of counsel guaranteed by the sixth amendment. To any person not

steeped in the intricacies of criminal practice, this contention would be unintelligible. James made enough money from his activities to afford a lawyer, but when he pleaded poverty the court appointed one for him. Counsel represented James diligently until shortly before trial, when James decided that counsel had not performed to his (unrealistic) expectations and demanded a different lawyer. After the district judge told James that he would not appoint another counsel at public expense (especially when a change of lawyers likely would delay the trial), James decided to go it alone. The judge threw cold water on this proposal, but James persisted, and the judge allowed James to conduct his own defense. Even then, the judge insisted that James's former lawyer remain in court as standby counsel to provide assistance on request. How could someone who had, but then fired, a competent lawyer--and who enjoyed full access to the services of that lawyer throughout the trial, and could have used them on discovering that the intricacies of trial were too much for a high school dropout--contend that he has been "deprived" of his constitutional right "to have the Assistance of Counsel for his defence"?

  No one could doubt that James acted voluntarily. The judge and prosecutor did not threaten him with sanctions if he elected the assistance of counsel, and he did not choose self-representation as the only way to be rid of an ineffective lawyer. What gives some color to James's position, however, is the proposition that, for a right as important as counsel, voluntariness is not enough. The decision must meet the standards of waiver--which means that it must be knowing and intelligent. See, e.g., Faretta v. California, 422 U.S. 806, 835 (1975), referring with approval to Johnson v. Zerbst, 304 U.S. 458, 464-65 (1938). Usually the difference between voluntariness and waiver is demonstrable knowledge of the right being surrendered and a formal decision to forego that right. Compare Schneckloth v. Bustamonte, 412 U.S. 218 (1973) (holding that a consent to search is voluntary if uncoerced, even though the suspect has not been told of a right to say no), with Miranda v. Arizona, 384 U.S. 436 (1966) (holding that during custodial interrogation waiver of the privilege

against compulsory self-incrimination is possible only if the suspect is told explicitly of certain entitlements).

Waiver does not depend on astute (or even rudimentary) understanding of how rights can be employed to best advantage. Defendants routinely plead guilty, waiving oodles of constitutional rights, in proceedings where the rights are named but not explained. For example, the judge will tell the defendant that the plea waives the right to a jury trial but will not describe how juries work, when they are apt to find a prosecutor's case insufficient, why the process of formulating and giving jury instructions creates issues for appeal, and so on. Judges will mention the right to confront one's accusers without describing how cross-examination can be used to undermine a witness's testimony. One could say that without such details the defendant's choice is "unintelligent," but that would impose unrealistic demands on the judicial system (and impute an unrealistic degree of knowledge to a monosyllabic answer to the query "Do you understand all that?"). It is enough that the judge not mis-inform the parties about the legal requirements. See Bousley v. United States, 523 U.S. 614 (1998). James does not say that he was misinformed about his entitlements. Proceedings where guilty pleas are taken are subject to the requirement that all waivers be knowing and intelligent, see Boykin v. Alabama, 395 U.S. 238, 243-44 (1969), so if the right-naming (but not right-explaining) protocol under Fed. R. Crim. P. 11 suffices (as it does) for waiver of jury trial and confrontation, then a similar approach should suffice for waiver of the right to counsel.

The contention that "knowing and intelligent" means something different when a defendant elects self-representation than when the same defendant elects a bench trial (or waives another constitutional right) has its genesis in Faretta, which held that the Constitution gives defendants a right to be free of unwanted legal services at trial. (And only at trial. See Martinez v. Court of Appeal, 528 U.S. 152 (2000).) Faretta constitutionalized, and thus extended to the states, an entitlement long recognized in federal courts by virtue of statute. See 28 U.S.C.

sec.1654. Toward the end of its opinion in Faretta the Court remarked, 422 U.S. at 835: "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open'", quoting from Adams v. United States ex rel. McCann, 317 U.S. 269, 279 (1942).

From this statement of preference ("should" is not "must") has grown a jurisprudence demanding more and more extensive advice and warnings to impress on the defendant the drawbacks of dispensing with counsel. E.g., United States v. Avery, 208 F.3d 597 (7th Cir. 2000); United States v. Sandles, 23 F.3d 1121 (7th Cir. 1994); United States v. Moya-Gomez, 860 F.2d 706 (7th Cir. 1988). The Federal Judicial Center's Benchbook for U.S. District Court Judges sec.1.02 (4th ed. 1996, with 2000 revisions) propounds 15 questions. This litany is a means of discouraging self-representation, which courts find inimical to well-functioning trials as well as hazardous to defendants' chances of success. But we doubt that any list can be mandated. Faretta adopted the waiver standard of Johnson v. Zerbst, which noted that the determination "whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." 304 U.S. at 464. That standard can be met without a demonstration that the accused has a deep understanding of how counsel could assist him. After all, Godinez v. Moran, 509 U.S. 389 (1993), holds that any person competent to stand trial is able to waive counsel, and the competence standard is met by persons who are barely able to understand the proceedings, let alone recognize how lawyers navigate the legal shoals.

Let us inquire, then, whether James knew "what he [was] doing and [made] his choice . . . with eyes open." On October 20, 1997, the district court appointed John Meyer to represent James. Fifteen months later, at a status conference

devoted to selection of a trial date, James first expressed dissatisfaction:

James: May I say something?

Court: Yes.

James: I don't want him [Meyer] working on my case.

Court: Well--

James: I want him off my case. I don't want him working on my case.
Court: I do not--what is the reason for that?

James: I don't trust him.

Court: I am here to set the case for trial. You have been in custody.

James: We don't agree--

Court: What?

James: We don't agree on certain things. That's all.

Court: Is this--

Mr. Meyer: Judge, this is the first I have heard of it. I tried to visit Mr. James last week and he refused a visit. But I have not had a chance to discuss this matter with him. But if he wants new counsel, of course, I have no objection.
Court: Well, I am not going to willy-nilly grant a request that is presented for the first time. I mean, if--what I will let you do is this: I would like you to discuss it with Mr. Meyer.

James: There is nothing to discuss with him.

After pending motions had been discussed, the parties took up the setting of a trial date, and the conference continued:

Court: I am going to set the case for March 15th. I think that is both workable and sufficiently out there for you all to be ready. And anything anyone wants to bring to my attention by way of counsel, I will ask you to do that in writing and file it with the Court.

Mr. Meyer: Judge, in that regard, I will visit with Mr. James in the Marshal's

lockup after our court appearance and if he directs me to do so, I will file a motion to withdraw then.

James: You can do that now. I'm not talking to you about nothin'.

Court: Talk to Mr. Meyer. There is no reason for you to mistrust him because I have known him for a long time and he is a very honorable lawyer. In fact, I used to work with him in another lifetime. . . . And I will tell you this, Mr. James: He is a very effective defense lawyer. I mean, he fights very hard for his clients. So, for you to come up with--you know, there naturally may be differences between a client and a lawyer on how to proceed; but, the idea that he would somehow not be faithful to your case is absolutely ridiculous, from what I know of Mr. Meyer. He is a very, very honorable and able defense lawyer, but that is my opinion. Okay. March 15th it is.

On January 22, 1999, three days after the status conference, Meyer filed a motion to withdraw as counsel, stating that he had conferred with James, who "reiterated that he did not trust counsel and further stated that he would refuse to cooperate with counsel in the defense of this case." On February 2 the court postponed the trial for two weeks, until March 29. On February 17 the district court held a status conference to take up once again James's objections to his lawyer. The court addressed a letter it had received from James. Although the letter has not been made a part of the record, it is apparent that it concerned James's renewed request for a different lawyer:

Court: Mr. James, I have looked at your request for new counsel and considered it and I have also looked at some legal authorities and considered the whole state of the case; and, I guess my first question to you is: In what way are you claiming that Mr. Meyer has not done right by you in his representation of you, since you first mentioned that to me, I think, perhaps less than a month ago and it was Mr. Meyer--I recall Mr. Meyer saying this was the first time he had ever heard of any dissatisfaction expressed? So, my question to you is: What is your complaint about Mr. Meyer?

James: Well, in the letter it says what my complaint is. That's why. He talked about me coming to see you--

Court: About pleading guilty, you mean?

James: Pleading guilty and talking about Mr. Hill. He don't talk about nothing about my defense.

* * *

Court: And you do not want to follow that course?

James: Right, I don't.

Court: Well, he did not say you had to follow that course.

James: That is true, but I don't want to hear that.

Judge Kocoras informed James that it is appropriate for a defense lawyer to discuss a plea with a client as a potential option and that James should not assume that a lawyer who raises the possibility of a guilty plea is a poor advocate. James was unmoved:

James: But I don't want him on my case.

Court: You don't want him on your case?

James: No.

Court: Well, this case has been a long time in the pipeline. He has been representing you for a long time. He is a very able lawyer.

James: He hasn't been coming to see me.

Court: Pardon me?

James: I don't know what is going on.

Court: What do you mean you do not know what is going on?

James: He hasn't been coming to see me for--I can count on my fingers how many times he came over to the [prison] to see me.

Court: Well, I think at some point you said five times.

James: He's got too many people he's

helping out. So, I prefer he helped them out.

Court: Well, he is appointed in this case. You do not have a right to have an attorney appointed that you want, rather than who is available to represent you. I know he--Mr. Meyer himself--was rather surprised that you had taken the position, and even he requested that--

James: That is the decision I choose.

Court: Pardon me?

James: That is the decision I choose.

Court: That is the decision you choose and here is the decision I choose: I do not think you have made out any basis for me to appoint a different lawyer. This case has been pending a long time. You have been in custody a long time. The other two defendants have been in custody a long time. We have continued the trial date regularly for everybody to get ready for trial. And I do not think it is in the interests of justice to continue it any more. And I do not think, quite frankly, there is a basis to believe that Mr. Meyer cannot adequately represent you. And, so, I am going to decline your request to have a different lawyer appointed to represent you.

James: I'll represent myself, then.

Court: Well, that is your choice. I think that is quite foolish, if I may say so.

James: That is what I'll do.

Court: I think Mr. Meyer would ably represent you. But we are too long in the game to get a new lawyer to review all of this material. We have had--there is, I think, material from two different trials--is that not right--for discovery purposes.

Government: Yes, Judge.

Court: And to put in a new lawyer now is to delay this case for probably, who knows. Six to nine months to a year.

Following that statement, Judge Kocoras asked James whether he understood the ramifications of his decision. The judge stated, among other things, that:

James's decision to represent himself
was his right,

James's decision was "foolish,"

the "stakes are very high,"

the court "discouraged that choice,"

"there are disadvantages in a person who
is not a lawyer in representing himself,"

it "is not a wise decision to represent
yourself,"

James "would be better served to have
Mr. Meyer represent [him],"

"just because you are representing
yourself, we are not going to change
[the] rules of evidence or any trial
rules just because you are not skilled or
learned in the law;" and

"the admissibility or inadmissibility of
evidence does not change just because you
are representing yourself."

The prosecutor chimed in with some
additional advice, which the district
judge seconded:

"that choice does not give him any
particular rights or privileges at the
[prison where he was incarcerated]",

"he will be faced with numerous burdens
and roadblocks to defending himself,"

"he will still be bound by the rules of
evidence and procedure and that there
will be no leeway just because he is
representing himself."
When James would not budge from his
position, the judge relieved Meyer but
appointed him as standby counsel to allow
James "to avail himself of Mr. Meyer's
professional abilities and skills." Meyer
was present and available at trial to
assist James and, in fact, assisted him.
James could have asked Meyer to take over
at any time, but through the end of the
trial James stuck to his decision and
served as his own lawyer. Only now does
he insist that the district judge did not
do enough to enlighten him about the
risks he was assuming.

   James behaved in a pig-headed fashion.

It is hard to imagine that by quoting from sec.1.02 of the Benchbook or expatiating about the drawbacks of self-representation ("a fool for a client. . .") the district judge could have talked him out of his decision. The Benchbook includes questions such as: "Do you understand that the U.S. Sentencing Commission has issued sentencing guidelines that will affect your sentence if you are found guilty?" and "Do you understand that the Federal Rules of Evidence govern what evidence may or may not be introduced at trial and that, in representing yourself, you must abide by those rules?" "Yes" answers to these questions do not evince understanding of the complexities that lie ahead. Lists do not convey knowledge or change minds. It is hard to imagine any defendant with even modest resolve responding: "Oh, now that I know that something called the 'Sentencing Guidelines' exists, I see the foolishness of representing myself." No one supposes that the judge must explain how the Guidelines work, for the validity of a waiver does not depend on possession of a legal education. As Johnson, Adams, and Faretta show, the question is not whether the district judge used a check-off list but whether the defendant understood his options. All a judge can do as a practical matter--all a judge need do as a legal matter--is ensure that the defendant knows his rights and avoids hasty decisions. Often asking the Benchbook questions may ensure that the defendant has his eyes open, but we do not read any of this court's decisions to hold that the litany is prescribed in every case or that advice about any particular disadvantage of self-representation is essential; such a reading would put us at odds with the Supreme Court.

In or out of the criminal justice system, people freely assume risks that they do not fully understand. Anyone who chooses a profession or a spouse, or decides to have children, takes chances subject to more variables than the mind can juggle. Yet we do not call these decisions unintelligent; venturing into the unknown with a sketchy idea of what lies ahead may be the wisest choice even when the odds are beyond calculation. Spelunkers, base jumpers, and investors likewise brave exposure to unexpected and unforeseeable events. James was in the

same position--and he knew it, having had some experience with the legal process while racking up prior convictions. After being told that he must comply with all rules of evidence and procedure, James was asked whether he understood and answered: "A little bit." That shows a sound appreciation of his position (James did not pretend that he had a legal education) rather than lack of intelligent choice. If James was about to face hazards he could not fully understand, his election was nonetheless valid because he knew that he was in uncharted waters. James could and did make a knowing and intelligent waiver. "[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to waive the right, not the competence to represent

himself." Moran, 509 U.S. at 399 (emphasis in original, footnote omitted).

Even with the aid of counsel on appeal, and the benefit of hindsight (having labored through the trial), James does not contend that there was any missing bit of knowledge that, if conveyed, would have led him to change his mind in February 1999. He really wants another crack at acquittal, not a more informed initial decision. Cf. United States v. Frazier-El, 204 F.3d 553, 559 (4th Cir. 2000). Section 1654 and Faretta require courts to respect a litigant's demand for self-determination at the most critical moment in the criminal process. That right is not honored if judges must depict self-representation in such unremittingly scary terms that any reasonable person would refuse. (If a reasonable person would welcome counsel, then does insisting on self-representation demonstrate incompetence to make the decision? To say this, however, would be to abolish the right of self-representation.) James knew and stood on his rights and, having received his due, cannot complain. A defendant bullied or frightened into acquiescing in a lawyer that he would rather do without would be in a much better position to say that the choice was not made knowingly or intelligently.

4. Defendants present a number of other arguments. All have been considered, but none requires discussion.

Affirmed

--------------69A272BE56567BC45DA5C843

Content-Type: text/plain; charset=us-ascii;
 name="00-2432"
Content-Transfer-Encoding: 7bit
Content-Disposition: inline;
 filename="00-2432"

In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2432

United States of America,

Plaintiff-Appellant,

v.

Tuan Steward,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 99-30215--G. Patrick Murphy, Chief Judge.

Argued November 9, 2000--Decided June 5, 2001


  Before Fairchild, Easterbrook, and Manion,
Circuit Judges.

  Fairchild, Circuit Judge.  Steward was
charged with possession with intent to
distribute cocaine base, crack, in
violation of 21 U.S.C. sec. 841(a)(1).
The jury acquitted him of that charge,
but found him guilty of the lesser
offense of possession of crack. The court
sentenced him to 21 months' imprisonment.
The government had sought imprisonment in
the range of 110 to 137 months and
appealed. We affirm.

  A citizen of Alton reported to police
that someone, later identified as Demond
Spruill, had been dealing in drugs all
afternoon, operating a black Ford Escort.
When a customer arrived in the area he
would enter the car with Spruill, the
vehicle would proceed a couple of blocks
while the transaction apparently
occurred, and the passenger would then

exit the vehicle. Later police officers made a traffic stop of the vehicle. Spruill was the driver, and Steward the passenger. Officer Rathgeb approached from the driver's side, and Officer Lane from the front. Lane noticed that Steward had a piece of yellow paper in his hand and something else which he moved toward his mouth. Lane ran to the passenger's side of the car, reached inside and applied pressure to Steward's throat, trying to get him to spit out the substance. Steward dropped the yellow piece of paper, and Lane saw him drop something else from his left hand. On cross-examination Lane testified that in his experience it is common for people to carry crack in a folded piece of paper because they don't want it to get pushed into the bottom of their pocket. Officer Rathgeb testified that he saw Steward successfully swallow an object and drop a yellow piece of paper. He saw Steward drop a clear plastic baggy with his left hand. It fell on the seat and later onto the console. He later found that the baggy contained three other plastic baggies, each containing a substance he believed to be crack cocaine. The parties later stipulated that it contained 8 grams of crack.

A government witness testified that 8 grams would amount to 40 doses and the prosecutor argued that Steward had bought 40 doses of crack and that quantity was evidence that he intended to sell it to others. The same witness testified on cross-examination that the three individual packages contained smaller rocks, and a purchaser could have picked out his rock. Defense counsel argued that Steward got into the car with Spruill, who handed him the bag. Steward picked out the rock he wanted and put it in his little piece of paper. The police appear and Steward puts the rock in his mouth to get rid of it, and gives the bag back to its owner, Spruill.

The jury convicted of possession on a verdict form referring to crack, but not stating a quantity. As Judge Murphy remarked at sentencing, the defense theory was that Steward was a mere buyer, a user, and "the jury thought that was the case also."

21 U.S.C. sec. 844(a) contains a number of authorizations of terms of

imprisonment for simple knowing or intentional possession of controlled substances. These are not separated into paragraphs. We have held that the third sentence creates a separate crime of possession of crack, which is not a lesser included offense of possession with intent to distribute a controlled substance. United States v. Hill, 196 F.3d 806, 808 (7th Cir. 1999). The earlier sentences provide terms of imprisonment for possession of controlled substances which vary in length according to prior convictions of drug offenses. If applied to Steward, with apparently more than two such convictions, the maximum imprisonment would be 3 years. We note that the court's instruction concerning the use of the verdict form as to the lesser offense of possession of crack appears to have been suggested by defendant, the point that the form of verdict should have called for a finding on possession of a controlled substance, rather than of crack, has not been argued here, and it may well be that Steward waived any such claim. The maximum term for possession of a controlled substance would be 3 years.

Steward did argue at sentencing that under the third sentence of sec. 844 the amount of crack possessed should have been charged and submitted to the jury. Apprendi v. New Jersey, 120 S. Ct. 2348 (2000), had not been decided at the time of trial, but trial counsel relied on Jones v. United States, 526 U.S. 227 (1999). Judge Murphy rejected the argument that the amounts of crack set forth in sec. 844 were elements of the offense rather than sentencing factors. Apprendi was decided before briefs were filed on appeal, but appellate counsel did not mention it or the Jones point in his brief or at oral argument, except on inquiry by members of the panel. We consider a claim on the effect of Apprendi waived.

In paragraph 22 of the PSR, the probation officer computed a base offense level of 26 by assuming, incorrectly, that Steward had been convicted of possession of more than 5 grams of cocaine base, and applying U.S.S.G. sec. 2D1.1. Together with Criminal History Category V (not in dispute), this leads to a sentencing range of 110-137 months. There was clearly an error here in that

the Statutory Index for 21 U.S.C. sec. 844(a) leads to Guideline 2D2.1, which in (a) provides a base offense level of 8 if the substance is crack. Subsection (b)(1), Cross References, provides that "If the defendant is convicted of possession of more than 5 grams of [crack], apply sec. 2D1.1 . . . as if the defendant had been convicted of possession . . . with intent to distribute." Although it is theoretically possible that one could be convicted of possessing 8 grams intending only personal use, the proof and contention in this case make it very clear, as the trial judge recognized, that the jury convicted Steward of possession of only the small amount he swallowed. The 5-gram condition for applying U.S.S.G. sec. 2D1.1 was clearly not met.

In paragraph 17 of the PSR, the probation officer stated "it appears that the defendant's relevant conduct involved the possession of crack cocaine that he swallowed (quantity unknown) and the cocaine base in the form of crack cocaine (8.0 grams) that he admittedly had in his possession." Steward objected. The government argued at sentencing that Steward exercised control over the package when he dropped it in an attempt to hide it, and this was relevant conduct. Judge Murphy made oral findings that the defendant's contact with the drugs was momentary and that the government has not shown by a preponderance of the evidence that he ever had possession of the entire amount. He later made written findings that Steward was merely purchasing the small amount of crack which he put in his mouth when the police approached. He noted evidence that Steward was only one of Spruill's customers and found that Steward possessed less than 1 gram of crack.

In this court, the government argued again that Steward's holding of the package in his left hand, however fleetingly, the resulting control over it, and dropping it in hope of concealment established possession of it. Steward had cited United States v. Kitchen, 57 F.3d 516 (7th Cir. 1995), dealing with possession in the sense of criminal culpability, and reversing a conviction. Judge Murphy made several oral references to comments in Kitchen

concerning lack of evidence "that the drug transaction was in any sense certain or complete." The government argues that Judge Murphy's finding that Steward did not possess the 8-gram package was clearly erroneous because these references showed his belief that he could not find possession without finding ownership. Kitchen surely does not stand for that proposition, and it is clear to us that Judge Murphy did not base his finding on it, but rather on his conclusion that Steward held the package only momentarily, and for the purpose of selecting the crack he desired to purchase.

The probation officer included Steward's handling and dropping the 8-gram package as relevant conduct. It is not clear whether he understood that the jury had convicted Steward of possession of less than 5 grams. His reference to an admission by Steward of possession of the package could only be based on a highly ambiguous reference by Steward to "that dope." Neither the probation officer nor government counsel explain how, where the conviction was for possession of 5 grams or less, the handling, or even possession, of the 8-gram package would factor into the computation of the base offense level. U.S.S.G. sec. 2D2.1 clearly calls for a base offense level of 8 unless the defendant is convicted of possession of more than 5 grams. Presumably uncharged possession could augment the drug quantity under U.S.S.G. sec. 2D1.1(a)(3), after a conviction of possession of more than 5 grams, but nothing in the Guidelines suggests that where the conviction is for 5 grams or less, uncharged possession can be used to make up the difference.

The judgment is affirmed.